404 So.2d 735 (1981)
DEPARTMENT OF INSURANCE, STATE OF FLORIDA, and Bill Gunter, Insurance Commissioner, Appellants,
v.
TEACHERS INSURANCE COMPANY, et al., Appellees.
No. 60573.
Supreme Court of Florida.
July 23, 1981.
Order May 12, 1981.
Rehearing Denied November 6, 1981.
*736 Daniel Y. Sumner and Edward L. Kutter, Dept. of Ins., Tallahassee, for appellants.
Leon H. Handley and Martin B. Unger of Gurner, Gurney & Handley, Orlando, for Teachers Ins. Co., Horace Mann Ins. Co., Cincinnati Ins. Co., and Queen City Indem. Co.; Earl B. Hadlow, John K. Aurell and Eleanor M. Hunter of Mahoney, Hadlow & Adams, Tallahassee, for Maryland Cas. Ins. Co., et al. and United States Fidelity and Guaranty Company, et al.; and Raymond Ehrlich and J. Stephen O'Hara, Jr. of Mathews, Osborne, Ehrlich, McNatt, Gobelman and Cobb, Jacksonville, for Travelers Indem. Co., et al., for appellees.

ORDER ACCEPTING JURISDICTION
The District Court of Appeal, First District, has certified, pursuant to article V, Section 3(b)(5) of the Constitution of Florida, that the order of the trial court passes upon a question of great public importance requiring immediate resolution by this Court. We accept jurisdiction.
ADKINS, BOYD, OVERTON and McDONALD, JJ., concur.
ENGLAND, J., dissents with an opinion with which SUNDBERG, C.J., and ALDERMAN, J., concur.
ENGLAND, Justice, dissenting.
I would decline to accept jurisdiction of these cases, which are among the first to reach us under newly-approved article V, section 3(b)(5) of the Florida Constitution (1980). This case does not possess any indicia of immediacy, as did the only case so far accepted and decided under this provision. See McPherson v. Flynn, 397 So.2d 665 (Fla. 1981). That case, it will be recalled, brought to us, just days before the 1981 Legislature commenced, a challenge to the seating of one of its members.
*737 The constitution provides in section 3(b)(5) that the Supreme Court:
May review any order or judgment of a trial court certified by the district court of appeal in which an appeal is pending to be of great public importance, or to have a great effect on the proper administration of justice throughout the state, and certified to require immediate resolution by the supreme court.
I do not doubt that these cases are of great public importance, but I suggest they lack the type of immediacy which this provision demands.
On March 19, 1981, a trial judge in the Second Judicial Circuit declared section 627.066, Florida Statutes (1980) to be "unconstitutional in its retroactive application to excessive profits realized during the years 1977, 1978 and 1979." The Insurance Commissioner of Florida, charged with determining the companies' excess profits and directing rebates, appealed the trial court's order to the First District Court of Appeal.
Shortly after the appeal was lodged, both the Commissioner and several (but not all) of the insurance companies filed with the district court suggestions that the appeal be certified to the Supreme Court before decision. The suggestions for certification declared counsel's belief that the issue involved  the retroactive validity of the 1980 excess profits rebate law  was of great public importance and required immediate resolution by the Supreme Court. Various bases for the suggestions of immediacy and importance were expressed. The Commissioner's contentions were:
1. that notices of excess profits indicate that over thirty million dollars in excess profits should be refunded to over one million policyholders in the State of Florida, and should these funds ultimately be ordered refunded as the result of reversal of the trial court's order, any delay in final resolution of the legal issues raised would delay enjoyment of any returned funds, and could result in total deprivation to some policyholders who might decease or become unlocatable during the course of the appellate process; and
2. that prompt final determination is of immediate importance, as application of the excess profits law is an ongoing process in which cumulative calculations from year to year are necessary.
The insurance companies principally suggested:
1. that they would be required to maintain reserves or contingent liabilities so long as the lawsuits were unresolved, thereby causing adverse effects on company earnings estimates;
2. that policyholders would be delayed in receiving excess profit rebates if the statute were ultimately found to be valid;
3. that other auto insurers were affected by the uncertain status of the statute;
4. that future filings required by the law are affected by the retroactive validity of the statute; and
5. that the appeal will affect all people in Florida who pay auto insurance premiums.
One insurance company objected to the suggestions for certification, stating a belief that there is no basis for immediate or emergency consideration by this Court.
At the outset, it is important to note that a district court decision in these cases will not necessarily require our attention or resolution. The case could be truly final after district court action, and the goals of the parties can be met without our intercession. Thus, if the statute were declared valid, review here would be discretionary, and considering that the case involves an issue of arguably limited, precedential significance, it well may not be accepted for review.[1] Moreover, it seems probable that a decision by a three-judge panel of the district court can be reached at least as quickly as by the seven members of this Court. (I assume the parties would request, and I'm sure obtain, expeditious consideration of the issue by that tribunal.) Still, even *738 conceding the possibility of review here and discounting the ease with which we might then review the district court's expository decision,[2] I would still argue against our acceptance of these cases now.
We recently explained the historical development of the constitutional amendment, adopted on March 11, 1980, which gave birth to article V, section 3(b)(5) of the constitution. Jenkins v. State, 385 So.2d 1356 (Fla. 1980). That explanation, which will not be repeated here, provides a backdrop to an understanding of the evolution of this particular provision.[3]
While I believe the Court's acceptance of this case under the new constitutional bypass provision is improvident, my disagreement does not imply in any way that the district court acted improperly in accepting the various requests for bypass certification. The district courts have had little guidance from this Court, and few of the state's district court judges had intimate acquaintance with the development of this Court's new jurisdictional framework.
All members of this Court did, though. A majority of this Court assumed responsibility for the formulation and adoption of the 1980 jurisdictional amendment. So too, it seems to me, this Court must assume responsibility to establish the standards for bypass certification. We cannot now ask 41 district court judges to guess what we intended, or now intend, to constitute the limited class of exceptions to their primary responsibility to decide direct appeals of cases dealing with statutory validity and constitutional construction.
The assignment of bypass certification to the Court's discretionary jurisdiction in section 3(b)(5) of article V, as contrasted with those cases assigned to the Court for mandatory review in sections 3(b)(1) and 3(b)(2) of article V, leaves no doubt as to the role we must play. Internal control by this Court over its affairs was clearly intended. This is particularly significant when it is recalled that bypass certification demands that we also accelerate the cases on our Court's docket. I start, therefore, from the premise that we must not accept these cases merely because they have been certified by a district court. This provision was specifically designed to guarantee our exercise of discretion, and consistency in its application requires our, not the district courts', decisional control.
The majority's acceptance of these cases for review has started the Court down a path with respect to the immediacy prong of our jurisdiction under section 3(b)(5), which is vastly different in degree from the standard applied in the Flynn case. The trial court's order in these cases, plainly and simply, does no more than declare invalid the retroactive application of a state statute. Obviously, that alone cannot meet an "immediacy" standard, for the same constitutional amendment which brought us bypass certification took away the direct appeal of trial court orders just like these.[4] Further, immediacy must relate to something other than the dollar significance of the legal question or the number of persons it affects, although those matters may affect the "importance" of the case.
In my view, the framers of section 3(b)(5) designed this procedure only to deal with disruptions to the system by which justice is administered in the state or to resolve important questions affecting governmental operations. The two examples mentioned frequently during the evolution of the 1980 constitutional amendment,[5] and the Flynn case, bear this out. I see none of these problems in the reasons offered for bypass certification here.
In the absence of an articulation by the majority of a reason to accept jurisdiction of these appeals, I can only guess at their view of immediacy. Two possibilities suggest themselves.
*739 First, my silent colleagues may intend to accept for bypass certification all cases involving statutory validity which the district courts choose to certify, in deference to the judgment and discretion of the district courts' judges. That would be unfortunate, not only for the reasons I have already expressed, but also because that deference in effect leaves no way to decline certified cases involving a construction of the federal or state constitution. These matters have had constitutional importance equivalent to validity cases, both before and after the 1980 amendment. The net effect of taking all these matters will be to render futile the struggle which provided the Court with mechanisms to control its own docket.
As a second possibility, my brethren may intend to decline some future cases certified by the district courts based, I suppose, on some subjective assessment of their relative significance. If that is their plan, whether their criteria will be dollar amounts, people affected, or any other feature of the merits of the lawsuits, I fear that my colleagues' ad hoc attempts to apply section 3(b)(5) in its intended form, or develop standards for immediacy, are doomed to failure. The history of this Court's exercise of its discretionary jurisdiction between 1967 and 1980 illustrates with abundant clarity the effects of standardless ad hocracy.[6] The net effect of this approach will not wholly negate the long overdue abolition of direct appeals, but it will reinstate the uncertainty, confusion and waste of resources which formerly attended our exercise of discretionary jurisdiction on the basis of shifting, subjective standards. This, too, will significantly erode the benefits of the 1980 constitutional change.
I would apply these standards to section 3(b)(5) cases:
(1) neither counsel in lawsuits nor district court judges should control this Court's decision-making priorities  both groups, being nonhomogeneous and busy, have motives and priorities necessarily different from this Court's;
(2) in order to give effect to the "immediacy" requirement of section 3(b)(5), cases accepted for bypass should be reserved for those rare instances when it is necessary to preserve the integrity of the operation of a governmental system; and
(3) in general, the validity or invalidity of a statute, or a construction of the federal or state constitution, presents no inherent potential for meeting the immediacy prong of section 3(b)(5).
At our urging, the people of Florida reduced our required jurisdiction, expressed their confidence in the ability of the district courts to decide constitutional and statutory issues, and effectively told us to exercise our review role by fairly precise and nonamorphous standards. Before today we made a good start toward those objectives. I see today's decision as a retreat from those principles.
SUNDBERG, C.J., and ALDERMAN, J., concur.
OVERTON, Justice.
This cause is a direct appeal from a circuit court judgment holding section 627.066, Florida Statutes (1979), as amended by chapter 80-236, Laws of Florida, to be unconstitutional as retroactively applied. The appeal comes directly to us under the new provisions of article V, section 3(b)(5), Florida Constitution (1980), having been certified by the First District Court of Appeal as involving an issue of great public importance which requires immediate resolution by this Court. We accept jurisdiction and reverse.
An understanding of the brief history of the contested statute is necessary to perceive the exact posture of the parties in this proceeding. Section 627.066 was created by chapter 77-468, Laws of Florida, which was a far-reaching "act relating to insurance and tort reform." This act was clearly intended to reduce escalating motor vehicle insurance rates, through such means as penalizing solicitation of motor vehicle tort claims, strengthening the procedural powers *740 of the Division of Fraudulent Claims, and requiring a state attorney to give a reason if he does not prosecute an alleged fraudulent claim referred by the division. That the legislature believed the overall results of chapter 77-468 would be beneficial to insurance rates is evident in section 43 of the law, which ordered a rate cap or freeze from June 4, 1977, to January 1, 1978.
Prior to the effective date of this act, there was no statutory provision expressly dealing with excess profits of a motor vehicle insurer, although there was and continues to be a section dealing with excessive rates.[1] Section 23 of chapter 77-468 created the excess profits law, section 627.066, the relevant portions of which provided:
627.066 Excessive profits for motor vehicle insurance prohibited. 
(1) Each insurer group shall file with the department, prior to July 1 of each year on a form prescribed by the department, the following data for Florida private passenger automobile business... .
... .
(2) Excessive profit has been realized:
(a) If there has been an underwriting gain for the 3 most recent calendar/accident years combined which is greater than the anticipated underwriting profit plus 5 percent of earned premiums for those calendar/accident years.
... .
(3) Each insurer group shall also file a schedule of Florida private passenger automobile loss and loss adjustment experience for each of the 3 most recent accident years... . The first year to be so reported shall be accident year 1976, so that the reporting of 3 accident years will not take place until accident years 1977 and 1978 have become available.
... .
(5) For the three most recent calendar/accident years, the underwriting gain or loss will be compared to the anticipated underwriting profit.
(6) If the insurer group has realized an excessive profit, the department may order a return of the excessive amounts to policyholders.
Section 26 of chapter 80-236, Laws of Florida, amended section 627.066 in several places, but most of the changes were either of a technical nature or dealt with aspects of the law not involved in the instant dispute such as the procedure for refunding excess profits. The only change the 1980 law made relevant to this proceeding was to mandate that the department order a return of any excess profits, rather than leaving that determination for the commissioner's discretion. We emphasize that the basic concepts of the 1977 excess profits law, including the nature and definition of such profits and the duties of insurers to file the required data, were unaffected by the 1980 law.
Section 27 of chapter 80-236, which appears to be the focus of the parties' attention in this proceeding, provides in part:
Section 27. It appearing to the Legislature that private passenger automobile insurer groups have realized excessive profits during all or part of the years 1977, 1978 and 1979, and that such profits were realized in part due to statutory changes for which rates were not adequately adjusted, it is the desire and intent of the Legislature that the provisions of sections 26 and 27 of this act shall apply retroactively to excessive profits realized during the years 1977, 1978, and 1979. In the event that such retroactive application is judicially determined to be unconstitutional, it is the intent of the Legislature that the act be given prospective application as stated hereinafter.
The department gave notice to appellees in late August of 1980 that "pursuant to *741 Section 627.066, 1979 Florida Statutes, as amended by Chapter 80-236, Laws of Florida," the department had preliminarily found that appellees had realized excess profits "for the statutory review period ending with calender/accident year 1979."
Appellees, in five consolidated cases, sought declaratory judgments and injunctions against the department. Appellees asserted the unconstitutionality of "the retroactive application" of the excess profits law, as amended in 1980, and the unconstitutionality of the 1980 law per se. The trial court issued a final judgment on the pleadings, finding section 627.066, as amended by chapter 80-236, unconstitutional in its retroactive application to the years 1977, 1978, and 1979 on two grounds: impairment of vested property rights acquired prior to enactment of the 1980 law and impairment of contracts entered into or renewed prior to enactment. The department was permanently enjoined from retroactively enforcing the law.
Appellees' two basic arguments are those relied upon by the trial court. The companies argue first that Florida's traditional "use and file" rating law was radically changed by the 1980 amendment and that retroactive application of the 1980 law must be viewed as an unnecessary and unconstitutional impairment of the contracts existing between companies and their insureds. The companies view the impairment of contracts as unnecessary in that the state's objective could have been achieved by the department disapproving the rates on a prospective basis under the "use and file" statute any time after they were filed. The companies view the impairment as unconstitutional because it fails the balancing test articulated by this Court in Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774 (Fla. 1979).
Appellees' second argument is upon what they assert is their vested right to the funds collected in calender/accident years 1977 through 1979. Appellees see the 1980 act as an attempt to force them to disgorge money earned some three years prior to the law's enactment, in violation of their due process rights.
Appellees' arguments are, to a certain extent, interrelated. It is fundamental that the laws of Florida are a part of every Florida contract. Board of Public Instruction v. Town of Bay Harbor Islands, 81 So.2d 637 (Fla. 1955). If the law existing when motor vehicle insurance contracts were entered into or renewed in 1977 or thereafter provided that the insurance premiums were the vested property of the insurers, then any retroactive divestment of those funds would be an impairment of contract as well. On the other hand, if the law provided that the insurers were not vested with the right to those funds, the insurance contracts would include that part of Florida's law and a subsequent divestment would not impair the contract.
After careful consideration of both provisions, we conclude that it is the 1977 excess profits law, and not the 1980 amendments, that provides the basis for the department's authority to order a return of excess profits. It is clear from even a cursory reading that the 1980 amendments to section 627.066 are not relevant to the department's authority. While the 1980 law removed the department's discretion not to order a return when excess profits are found, the companies are unaffected by this change unless they can allege and prove, which they have not, that but for the 1980 amendment, the department would not have initiated the refund orders.
We turn then to the 1977 law, which must be the legal basis for the intended refund of excess profits. We view this law as working in the following manner. Each year the insurance companies must report certain data to the department as specified in subsection (1) of the law. That data is for the immediately preceding calender/accident year. The department is required under subsection (5) to review that data after combining it with data for the two years preceding it: "For the three most recent calender/accident years, the underwriting gain or loss will be compared to the anticipated underwriting profit." Although *742 the statute does not specify it, we believe it is implied that the department must do this within a reasonable period after receiving the required data, which the department apparently did in the instant case. Clearly there must be some point beyond which the department is estopped from applying the excess profits law, since it is unreasonable to assume that the legislature intended to require insurers to retain excess profits forever in fear of a refund order far after the profits were realized.
If the department determines that the data indicate that the most recent three-year period resulted in excess profits to a company, it may under the 1977 law and must under the 1980 law order a return of the excessive amounts. It is critical to note that what is actually being returned is the sum of those amounts from each of the three years in question that represent the amounts over the threshold of excess profits. The amount being returned is not from the premiums of just the most recent year, unless there were no excess profits in the earlier years. What the statute envisions is that the insurers must, from the beginning of any three-year period, take steps to guarantee that those premiums representing excess profits will be available to be refunded should the department order it. To those funds the insurers have no vested right; to those funds representing profits below the definition of excess, they do have vested rights.
Thus, the 1977 law, as of its effective date of September 1, 1977, changed the nature of motor vehicle insurance ratemaking. As of September 1, 1977, insurers were put on notice that the rights to some premiums from contracts entered into or renewed after that same date may not vest for at least three years. We emphasize that not all funds are affected, because the only property not fully belonging to the companies are those funds representing the excess profits as measured by the specified three-year period.
The problem with the department's intended action, as mandated by the 1980 amendment, is that calendar/accident year 1977 is included in the three-year period in which profits are being viewed. The 1977 law did not take effect until September 1, 1977. Prior to that date the insurers had vested rights in all profits realized, even excess ones, because there was nothing in the law to indicate otherwise. The contracts entered into or renewed prior to September 1, 1977, could not have included as part of those contracts the 1977 excess profits law. Since a substantial part of calendar/accident year 1977 predates the excess profits law, that year, despite the manifest legislative intent, cannot be included in any computation of excess profits if to do so would deprive the companies of those 1977 profits, to which they had a vested right.
However, this conclusion is not fatal to the department's attempt in 1980 to order a return of excess profits. Although the clear legislative intent in the 1977 act is that excess profits be measured on a three-year basis, the equally clear legislative intent of the 1980 amendments is that the excess profits realized in 1977, 1978, and 1979 be returned to the policyholders to the extent possible. We can reconcile these expressions of the legislature's intent by construing the law, as applied in 1980 for the period 1977 through 1979, to require the department to include calendar/accident year 1977 in its calculations if and only if the inclusion of such would work to the benefit of that specific company. In other words, an insurer is entitled to the benefit of including 1977 in calculating excess profits if to do so would work to its benefit. The department is entitled to order a return of excess profits realized in 1978 and 1979, except to the extent offset by less than excessive profits in 1977.
Clearly the legislature did not intend there be insurance company excess profits resulting from the tort and insurance law reform of 1976 and 1977. The intent was rather to have both policyholders and insurance companies benefit from the reform. We emphatically reject the assertion that windfall profits are protected by the impairment of contract clause. The judgment below is reversed and the permanent *743 injunction dissolved. The department may proceed in accordance with the views expressed in this opinion.
It is so ordered.
ADKINS, BOYD and ALDERMAN, JJ., concur.
SUNDBERG, C.J., dissents with an opinion in which ENGLAND and McDONALD, JJ., concur.
SUNDBERG, Chief Justice, dissenting.
I dissent. See State Department of Transportation v. Edward M. Chadbourne, Inc., 382 So.2d 293 (Fla. 1980); Dewberry v. Auto-Owners Insurance Co., 363 So.2d 1077 (Fla. 1978).
ENGLAND and McDONALD, JJ., concur.
NOTES
[1] England, Hunter and Williams. Constitutional Jurisdiction of the Supreme Court of Florida: 1980 Reform, 32 U.Fla.L.Rev. 147, 183-84 (1980).
[2] Id. at 181, 183 n. 210.
[3] A more complete history and explanation of the 1980 amendment appears in England, Hunter and Williams, supra note 1.
[4] Id. at 164-66.
[5] Id. at 193-96.
[6] Id. at 150-53.
[1] Section 21 of chapter 77-468 removed motor vehicle insurance from the scope of the general excessive rates provision contained in subsection (2) of section 627.062, Florida Statutes, and created new provisions dealing with excessive motor vehicle insurance rates by a new section 627.0651, Florida Statutes. The relationship, if any, between this latter section and the excess profits law is not at issue in this proceeding.