SCHWARTZ, Senior Judge.
 

 An ever-diminishing few of us remember Alan King’s story about a homeowner with a fire and theft policy who made a claim when his house burned down. He was met with the company’s denial of coverage on the ground that he needed instead a fire
 
 or
 
 theft policy and that, as written, the policy applied only if he were robbed while his house was on fire.
 

 This case shows that things never really change. The insured bought and for thirteen years faithfully paid the semi-annual premiums for a “Home Health Care Policy” which covered home “primary” services, those of a registered nurse or the like and “secondary” services, including those of non-professional providers such as a home health aide. When, however, she needed and received only the latter kind, she was denied payment, successfully at first, upon the assertion that she had to have both. Fortuitously enough, however, Florida law specifically outlaws the use of that particular contrivance. We do no more than follow the legislature in holding that the insurer cannot get away with it.
 

 We now revert to a traditional, formulaic, non-discursive discussion of the case before us.
 

 I.
 

 Bell Care Nurses Registry, Inc., appeals from a summary judgment entered in favor of Continental Casualty based on the conclusion that home health aide services Bell provided to Continental’s insured, Jean Beckerman, were not covered under Beckennan’s “Home Health Care Policy.” We reverse.
 

 Bell sued under an assignment from Beckerman, alleging that Continental failed to pay over $20,000 for the services Bell provided to Beckerman from June 30, 2005 to June 17, 2006. Bell asserted that it had been engaged by Beckerman and that the services it provided were covered under Beckerman’s long term care policy.
 

 Continental answered denying coverage on the ground that the policy expressly provided coverage for “Secondary Services,” such as the services at issue,
 
 only
 
 where such services were received in a week in which at least one “primary” service was also received. The policy defined “Secondary Services” as “services provided by a medical social worker; occupational therapy; home health aide services; and homemaker services;” it defined “Primary Services” as “nursing care services provided by a registered nurse (RN), a licensed practical or vocational nurse (LPN or LVN); physical therapy; and speech therapy.” It is undisputed that Beckerman did not also receive at least one “primary” service during the same week as the “secondary” services in question.
 

 The policy, first issued to Beckerman in 1990, provided:
 

 HOME HEALTH CARE BENEFIT
 

 If You receive Home Health Care Services in a Home Convalescent Unit, We will pay you a benefit equal to the amount of expenses incurred, but not to exceed the Maximum Amount for each Home Health Care Visit You receive. Benefits begin after the Elimination Period and are payable for the length of the Benefit Period. However, in order for benefits to be payable for Secondary Services such services must be received in a Week in which at least one Primary Service was received. Benefits need not be payable for such Primary Services.
 

 
 *15
 
 The policy stated that it was: “GUARANTEED RENEWABLE FOR LIFE[,] PREMIUMS SUBJECT TO CHANGE,” and acknowledged:
 

 If any provision of this policy is in conflict with the statutes of the state in which You reside on the policy Effective Date, the provision is automatically amended to meet minimum requirements of the statute.
 

 The policy contained a “1st renewal” date of 2/6/91, and continued in effect every six months thereafter.
 

 Bell moved for judgment arguing its entitlement to payment based in part on section 627.94071(2), effective October 1, 1992, which specifically invalidates the policy clause upon which the insurer successfully relied below:
 

 Minimum standards for home health care benefits
 

 A long-term care insurance policy ... that contains a home health care benefit must meet or exceed the minimum standards specified in this section. The policy ... may not exclude benefits by any of the following means:
 

 [[Image here]]
 

 (2) Requiring that the insured or claimant first or simultaneously receive nursing or therapeutic services in a home setting or community setting before home health care services are covered.
 

 (Emphasis added). Bell argued that since Beckerman’s policy had been “renewed” a number of times after the 1992 effective date of section 627.94071, the section applied in 2005 and 2006 when the services at issue were rendered. Continental maintained that application of the statute would amount to an unconstitutional impairment of contract. Although the trial court agreed with Continental, we agree with Bell.
 

 II.
 

 “It is generally held that the renewal of a contract of insurance constitutes the making of a new contract for the purpose of incorporating into the policy changes in the statutes regulating insurance contracts.”
 
 Metropolitan Prop. & Liab. Ins. Co. v. Gray,
 
 446 So.2d 216, 218 (Fla. 5th DCA 1984); see
 
 May v. State Farm Mut. Auto. Ins. Co.,
 
 430 So.2d 999, 1001 (Fla. 4th DCA 1983) (“It is the law in this state that a contract of annually renewable insurance forms a new contract at each renewal for the purpose of incorporating into the contract the statutory provisions enacted after the creation of the original contract relationship.” (quoting
 
 Thieme v. Union Labor Life Ins. Co.,
 
 12 Ill.App.2d 110, 138 N.E.2d 857, 860 (1956))); see also
 
 Marchesano v. Nationwide Prop. & Cas. Ins. Co.,
 
 506 So.2d 410, 413 (Fla.1987) (“The general rule in Flori da that upon each renewal of an insurance policy an entirely new and independent contract of insurance is created [and] [a]n insurance policy is normally renewed upon the payment of a new premium.”);
 
 Adams v. Aetna Cas. & Sur. Co.,
 
 574 So.2d 1142, 1148 (Fla. 1st DCA 1991) (observing that “when each of the policies were renewed after October 1, 1982, it became a new contract required to conform to the newly-amended law, and [insurer’s] obligations and [insured’s] correlative rights regarding statutorily-required UM/UIM coverage necessarily became an inherent part of the renewal policy”);
 
 Landi v. Nationwide Mut. Fire Ins. Co.,
 
 529 So.2d 1170, 1171 (Fla. 2d DCA 1988) (observing that the policy at issue had been renewed after the enactment of certain statutory requirements and that “[t]he general rule in Florida is that upon each renewal of an insurance policy an entirely new and independent contract of insurance is created” (quoting
 
 Marchesano,
 
 506 So.2d at 413));
 
 *16
 
 see generally 12 J. Appleman, Insurance Law and Practice, § 7041, at 175-76 (1981) (observing “where an existing policy is renewed, although the results vary, the better rule is to regard the statute as applicable to the extended contract”). By the time Bell rendered the services at issue to Beckerman, section 627.94071 had been in effect for some thirteen years and her policy had been repeatedly “renewed” with full payment of all the premiums. Under the principle stated by these authorities, the statute therefore applies to the present controversy.
 

 Continental relies on
 
 Moore v. Metropolitan Life Insurance Co.,
 
 33 N.Y.2d 304, 352 N.Y.S.2d 433, 307 N.E.2d 554 (1973), and
 
 Oates v. Equitable Assurance Society of the United States,
 
 717 F.Supp. 449 (S.D.Miss.1988), for the contrary position that, properly considered, the policy was not subsequently “renewed,” but merely continued in effect from the date it was first issued. We find neither case persuasive. First, as we see it,
 
 Moore
 
 actually supports Bell’s claim. Considering the application of a statutory change to an insurance policy,
 
 Moore
 
 observed: “where, as here, an insurer has the absolute right to terminate a policy on its anniversary date
 
 or to change the insurance premium rate without the State’s consent, the policy is modified [to apply statutory changes] upon renewal of the policy.” Moore,
 
 352 N.Y.S.2d 433, 307 N.E.2d at 557 (emphasis added). Continental relies on
 
 Moore
 
 ⅛ additional observation that “[wjhere, however, the insurer does not have the right to terminate the policy or change the premium rate without consent of the State, renewal, by the payment of premiums, merely continues in force the pre-existing policy, and statutes enacted subsequent to its original enactment cannot be applied.”
 
 Id.
 

 But Beckerman’s policy “clearly” provided:
 

 We can change the premium rate for the policy, but only if We give You 31 days prior written notice and
 
 We change the premium rate for everyone who has this policy form in Your policy rating group in Your state.
 

 (Emphasis added). Because the decision to raise renewal rates was thus left in the hands of the insurer, so long as it provided its insured’s timely notification and treated holders of the same type of policies in the same manner, in accordance with
 
 Moore,
 
 no unconstitutional impairment of contract resulted from the application of section 627.94071 to Beckerman’s policy.
 

 Oates
 
 essentially stands for no more than the proposition that “[wjhether the renewal of a policy of insurance constitutes a new and independent contract or whether it is instead a continuation of the original contract ‘primarily depends upon the intention of the parties as ascertained from the instrument itself.’ 18 Couch, § 68:40, at 41.”
 
 Oates,
 
 717 F.Supp. at 452. While both the
 
 Oates
 
 policy and Mrs. Beckerman’s policy contained language identifying the policies as “GUAREN-TEED RENEWABLE FOR LIFE,” this pronouncement alone is not determinative. The Beckerman policy immediately thereafter alerted “PREMIUMS SUBJECT TO CHANGE,” and explained:
 

 Payment of the First premium keeps your policy in force for the Policy Term. You may
 
 renew
 
 this policy for further periods by payment of the
 
 Renewal
 
 Premium, subject to Our right to change premium as described below.
 

 (Emphasis added). The Policy Schedule clearly identified the “POLICY TERM” as “SEMI-ANNUAL,” and the claims portion of the policy clearly notified that premiums were “due at the start of each ‘Policy Term.’ ” While the
 
 Oates
 
 court
 
 *17
 
 concluded “it is clear that the parties contemplated one continuous contract of insurance and not separate successive contracts of one month each,”
 
 id.,
 
 we see no such clear vision of one continuous contract in the agreement between Becker-man and Continental. Since, as we all know, insurance policy language must “ ‘be construed liberally in favor of the insured and strictly against the insurer,’ ”
 
 Flores v. Allstate Ins. Co.,
 
 819 So.2d 740, 744 (Fla.2002) (quoting
 
 State Farm Fire & Cas. Co. v. CTC Dev. Corp.,
 
 720 So.2d 1072, 1076 (Fla.1998)), we therefore conclude that the extensions of coverage were true “renewals,” within the legal meaning and with the legal consequences of that term.
 

 We also point out that in first enacting the “Long-Term Care Insurance Act,” § 627.9401, Fla. Stat., in 1988, the legislature stated that it intended the Act to apply to “policies issued or renewed on or after [October 1, 1988].” Ch. 88-57, § 3, at 312, Laws of Fla. See
 
 Seaboard Air Line Ry. Co. v. Watson,
 
 103 Fla. 477, 137 So. 719, 723 (1931) (quoting
 
 Burr v. Fla. E. Coast Ry. Co.,
 
 77 Fla. 259, 81 So. 464, 464 (1919)), where the Court stated:
 

 In determining the legality and effect of a statutory regulation, the court should ascertain the legislative intent; and, if the ascertained intent will permit, the enactment should be construed and effectuated so as to make it conform to, rather than violate, applicable provisions and principles of the state and federal Constitutions, since it must be assumed that the Legislature intended the enactment to comport with the fundamental law.
 

 III.
 

 While application of the “renewal” principle is alone dispositive, a number of other points support our decision to reverse. First, we believe that the policy is both ambiguous and essentially misleading. The front page policy schedule identifying the “BENEFITS” provides:
 

 POLICY SCHEDULE
 

 $70.00 PER VISIT MAXIMUM AMOUNT
 

 7 MAXIMUM VISITS PER WEEK
 

 104 WEEKS (2 YEARS) MAXIMUM BENEFIT PERIOD
 

 0 ELIMINATION PERIOD (NUMBER OF VISITS BEFORE BENEFITS BEGIN) IF PRIOR HOSPITAL OR NURSING FACILITY CONFINEMENT
 

 5 IF NO PRIOR HOSPITAL OR NURSING FACILITY CONFINEMENT
 

 Only in the subsequent “Home Health Care Benefit” section of this home health care policy was this critical requirement of paired services identified. Moreover, this key and determinative factor is not mentioned at all in the policy “EXCLUSIONS AND LIMITATIONS” section.
 

 An insurer is required to make clear precisely what is excluded from coverage.
 
 Union Am. Ins. Co. v. Maynard,
 
 752 So.2d 1266, 1268 (Fla. 4th DCA 2000). The requirement at issue was akin to an exclusion and as such, strict construction is appropriate.
 
 Mactown, Inc. v. Cont’l Ins. Co.,
 
 716 So.2d 289, 291 (Fla. 3d DCA 1998). As the Florida Supreme Court observed long ago, so long as an insurance contract is
 

 drawn in such a manner that it requires the proverbial Philadelphia lawyer to comprehend the terms embodied in it, the courts should and will construe them liberally in favor of the insured and strictly against the insurer to protect the buying public who rely upon the companies and agencies in such transactions.
 

 
 *18
 

 Hartnett v. Southern Inn. Co.,
 
 181 So.2d 524, 528 (Fla.1965). In addition, Continental’s failure to adhere to this principle is especially pernicious in this particular field. A person like Ms. Beekerman, making plans for the possible consequences of the infirmities of old age, is entitled to believe that she is buying protection from the common expenses of care such as the vital services of a home health aide and homemaker, described as “secondary” services in the policy, such as preparing her meals and helping her to the bathroom, so as to keep her out of the nursing home, and in her own. See
 
 Bergman v. Serns,
 
 443 So.2d 130 (Fla. 3d DCA 1983), pet. for review dismissed, 450 So.2d 486, 488 (Fla.1984). It is wrong, as in this case, for her to be told that there is no such coverage, without unnecessary, professional “primary” service — only after the care has already been provided. The legislature’s enactment of the statute was undoubtedly based, in part, upon just such consideration.
 

 In addition, this policy provision promotes the type of economic waste the law in general abhors. See
 
 Lee County Elec. Co-op. v. Marks,
 
 501 So.2d 585, 587 (Fla.1987) (condemning economic waste and inefficiency resulting from utilities “racing to serve”);
 
 Fla. Dep’t of Citrus v. Griffin,
 
 239 So.2d 577, 578 (Fla.1970) (observing the legislative desire to avoid economic waste in the citrus industry);
 
 Rabin v. Conner,
 
 174 So.2d 721, 722 (Fla.1965) (recognizing legislation aimed at discouraging economic waste facing certain farm producers);
 
 Tropical Jewelers, Inc. v. Nationsbank, N.A. (South),
 
 781 So.2d 392, 410 (Fla. 3d DCA 2000) (acknowledging UCC provision goal of “guarding] against economic waste”). The clause, requiring as it does that an insured employ an unneeded “primary” service in order to secure a needed and paid for “secondary” service, encouraged just such economic waste.
 
 [1]
 

 Finally, although we need not directly declare the policy provision at issue void as against public policy, it is highly likely that, for the reasons we have outlined, this is the case. See, e.g.,
 
 Harris v. Gonzalez,
 
 789 So.2d 405, 409 (Fla. 4th DCA 2001), where the court said:
 

 The term “public policy” is not easily defined. “In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like.”
 
 City of Leesburg v. Ware,
 
 113 Fla. 760, 153 So. 87, 89 (1934);
 
 Neiman v. Galloway,
 
 704 So.2d 1131 (Fla. 4th DCA 1998)(quoting
 
 Edwards v. Miami Transit Co.,
 
 150 Fla. 315, 7 So.2d 440, 442 (1942) (quoting
 
 Atlantic Coast Line R. Co. v. Beazley,
 
 54 Fla. 311, 45 So. 761 (1907))) (‘[A] contract is not void, as against public policy, unless it is injurious to the interest of the public, or contravenes some established interest in society.’). The Harris/Gonzalez contract violates public policy because Dr. Gonzalez promised to refer his patients to EHI exclusively in return for fifty percent of the net corporate profits.
 
 This is precisely the type of
 
 
 *19
 

 financial incentive for a health care provider that the legislature determined is harmful to the public’s safety and welfare.
 

 (Emphasis added). We consider the stratagem involved here just as unacceptable. And, again, its harmful nature is supported by the legislature’s enactment of section 627.94071, which, of course, specifically bars that result. See also
 
 Dade County Med. Ass’n v. Hlis,
 
 372 So.2d 117, 119 (Fla. 3d DCA 1979) (“The non-applicability of the statutory privilege does not mean, however, that we may or should ignore the considerations of public policy which informed the enactment of the statute and of which we have spoken.”).
 

 While it is true that
 

 if a statute attaches new legal consequences to events completed before its enactment, the courts will not apply the statute to pending cases, absent clear legislative intent favoring retroactive application!;,]
 

 Metro. Dade County v. Chase Fed. Hous. Corp.,
 
 737 So.2d 494, 499 (Fla.1999), that rule does not apply. Bell seeks to recover for services provided to the insured in 2005 and 2006. These dates of service did not occur and were not completed until many years after the 1992 creation of section 627.94071. Thus, in order to invalidate conditions of the Continental policy, we do not apply the statute retroactively.
 

 IV.
 

 Accordingly, we hold that Continental was required to comply with section 627.94071.Continental could not make Bell’s recovery for secondary services contingent on Beckerman’s concurrent use of primary services. The order under review is reversed, and the cause remanded for entry of judgment for Bell in the appropriate amount.
 

 Reversed and remanded.
 

 [1]
 

 . The trial judge was troubled by the recovery of benefits limited by the mandatory pairing of services, asking counsel for Continental “So you would have preferred to have Bell Care send somebody in each week and charge you and you get to pay more; is that right?” The judge followed with the question: "Does the legislature have a problem or would the government have a problem with Bell Care charging for medically unnecessary services? I would.” So would we. Moreover, we are cynical enough to speculate that if the insured had employed a "primary” provider she did not need in order to receive payment for secondary services she did, the carrier would refuse payment for both.