[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15371
Non-Argument Calendar
_____

D.C. Docket No. 8:12-cv-02064-JSM-AEP


THOMAS C. SHELTON,
MARA G. SHELTON,

                                        Plaintiffs-Appellees,

versus


LIBERTY MUTUAL FIRE INSURANCE COMPANY,

                                        Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 21, 2014)

Before HULL, MARCUS and FAY, Circuit Judges.

PER CURIAM:

In this insurance-coverage dispute, Defendant-Appellant Liberty Mutual appeals the district court's grant of summary judgment to Plaintiffs-Appellees Thomas and Mara Shelton ("the Sheltons"). After careful review of the record and the briefs, we reverse the district court's grant of summary judgment in favor of the Sheltons and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This case concerns whether the Sheltons' homeowners policy with Liberty Mutual covers the Sheltons' claim for a "sinkhole loss" to their property in Oldsmar, Florida. Before we turn to the Sheltons' claim and the policy, we begin with some background information about insurance coverage for sinkhole losses in Florida.

### A.    Insurance Coverage for Sinkhole Losses under Florida Law

Since 1981, Florida law "requires property insurers to make sinkhole coverage available." Cincinnati Ins. Co. v. Wiltshire, 472 So. 2d 1276, 1277 n.1 (Fla. Dist. Ct. App. 1985). From 1981 to 2004, Florida law defined the term "sinkhole loss" as "actual physical damage to the property covered arising out of or caused by sudden settlement or collapse of the earth supporting such property only when such settlement or collapse results from subterranean voids created by the

2

action of water on a limestone or similar rock formation." Fla. Stat. § 627.706 (1981).

In 2005, the Florida legislature redefined "sinkhole loss" as "structural damage to the building, including the foundation, caused by sinkhole activity." 2005 Fla. Sess. Law. Serv. Ch. 2005–111, § 17 (West). Although it limited the definition of "sinkhole loss" to cases where there was "structural damage" to a covered property, the 2005 amendment did not define the term "structural damage." See id.

In May 2011, the Florida legislature amended § 627.706 again to supply a definition for the phrase "structural damage" "as used in connection with any policy providing coverage . . . for sinkhole losses." Fla. Stat. § 627.706(2)(k) (2011) (emphasis added). The legislature provided a technical, five-part definition: "Structural damage" occurs only when "a covered building . . . has experienced" one of the five events enumerated and defined in the statute.[1] See id.

---

[1]The five events are:

> 1. Interior floor displacement or deflection in excess of acceptable variances as defined in ACI 117-90 or the Florida Building Code, which results in settlement-related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code;
>
> 2. Foundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement-related damage to the primary structural members or primary structural systems that prevents those members or systems from supporting the loads and forces they

**B.    Liberty Mutual's Policy and the Sheltons' Claim**

Subsequent to the May 2011 legislative change, Liberty Mutual issued a renewal homeowners insurance policy for the Sheltons' property, effective from July 18, 2011 to July 18, 2012.  In January 2012, the Sheltons made a claim under the policy for a "sinkhole loss" to their property.  Liberty Mutual's policy provides that "[s]inkhole loss means structural damage to the building, including the foundation, caused by sinkhole activity."  The policy does not define the key phrase "structural damage to the building."  The policy also does not reference any statutory or external definitions of this phrase.

----

were designed to support to the extent that stresses in those primary structural members or primary structural systems exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location;

3. Damage that results in listing, leaning, or buckling of the exterior load-bearing walls or other vertical primary structural members to such an extent that a plumb line passing through the center of gravity does not fall inside the middle one-third of the base as defined within the Florida Building Code;

4. Damage that results in the building, or any portion of the building containing primary structural members or primary structural systems, being significantly likely to imminently collapse because of the movement or instability of the ground within the influence zone of the supporting ground within the sheer plane necessary for the purpose of supporting such building as defined within the Florida Building Code; or

5. Damage occurring on or after October 15, 2005, that qualifies as "substantial structural damage" as defined in the Florida Building Code.

Fla. Stat. § 627.706(2)(k).

4

In response to the Sheltons' January 2012 claim, Liberty Mutual sent an expert to examine the damage to the Sheltons' property.  As relevant here, Liberty Mutual's expert found cosmetic damage to the Sheltons' home but no "structural damage" within the meaning of § 627.706(2)(k).  In other words, the damage to the Sheltons' home did not fall within the five-part definition of "structural damage" outlined in the applicable statute regulating polices for sinkhole losses.

Based on this expert opinion, Liberty Mutual declined coverage for the Sheltons' claim.  Liberty Mutual maintained that its policy did not provide coverage for the Sheltons' claim because (1) a "sinkhole loss" is defined to require "structural damage to the building," (2) the applicable Florida statute, § 627.706(2)(k), defines what constitutes "structural damage," and (3) the Sheltons' home did not experience "structural damage" within that statutory definition.

## C.    The Sheltons' Lawsuit

Unhappy with Liberty Mutual's decision, the Sheltons brought suit alleging that Liberty Mutual's denial of coverage breached the terms of the insurance policy.  Liberty Mutual moved for summary judgment, contending that the statutory definition of "structural damage" in § 627.706(2)(k) governs the interpretation of the phrase "structural damage" in the policy.

The district court disagreed, holding that the statutory definition of "structural damage" was inapplicable because the insurance policy did not reference the statute or incorporate the statutory language. The district court concluded that the phrase "structural damage to the building" in the policy should be given its plain meaning, which—according to the district court—is "damage to the structure." The district court effectively read "structural damage to the building" to mean "any damage to the structure."

A few months later, the Sheltons moved for summary judgment. In response, Liberty Mutual renewed its argument that the statutory definition of "structural damage" in § 627.706(2)(k) applies to the Sheltons' policy. Liberty Mutual also proffered its expert's finding that the damage to the Sheltons' home does not meet the statutory definition of "structural damage."

Granting the Sheltons' motion, the district court reiterated its prior conclusion that the phrase "structural damage to the building" in the policy means "damage to the structure," instead of the more restrictive statutory definition of "structural damage." The district court concluded that the salient issue then was whether sinkhole activity caused any damage to the Sheltons' structure.

The Sheltons' experts determined that all of the damage to the Sheltons' home was "primarily caused by the sinkhole activity." As to the amount of damages, the Sheltons' experts opined that subsurface repairs costing at least

6

$81,345 were necessary to remediate the subsurface conditions and to stabilize and repair the foundation and structure of the Sheltons' home. In addition, above-ground repairs in the amount of $31,680 were needed to fix the cosmetic damages to the Sheltons' home.[2] The district court then entered final judgment for the Sheltons in the amount of $113,025. Liberty Mutual timely appealed.

## II. DISCUSSION[3]

### A.    Florida Insurance Law

"Because federal jurisdiction over this matter is based on diversity, Florida law governs the determination of the issues on this appeal." State Farm Fire & Cas. Co. v. Steinberg, 393 F.3d 1226, 1230 (11th Cir. 2004). The pivotal question here is whether the statutory definition of "structural damage" contained in § 627.706(2)(k) applies to the phrase "structural damage" in the Sheltons' policy. We outline the relevant Florida law and then apply it to this case.

---

[2]Although Liberty Mutual seemed to contest some of these findings, it ultimately stipulated for purposes of the Sheltons' motion for summary judgment that (1) the Sheltons' home exhibited minor cosmetic damage caused by sinkhole activity and (2) the "total amount [the Sheltons] may claim under the policy for damages for the cost to repair the minor physical (cosmetic) damage exhibited by insured dwelling caused by sinkhole activity and the cost for work to remediate subsurface conditions is $ 129,000.24."

[3]"We review a district court's summary judgment decision de novo, applying the same legal standards as those that governed the district court." Lodge v. Kondaur Capital Corp., 750 F.3d 1263, 1268 n.6 (11th Cir. 2014). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"It is fundamental that the laws of Florida are a part of every Florida contract." Dep't. of Ins., State of Fla. v. Teachers Ins. Co., 404 So. 2d 735, 741 (Fla. 1981). "[A]ll existing applicable or relevant and valid statutes, . . . at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention." Northbrook Prop. & Cas. Ins. Co. v. R & J Crane Serv., Inc., 765 So. 2d 836, 839 (Fla. Dist. Ct. App. 2000) (quotation marks omitted); Gordon v. State, 608 So. 2d 800, 802 (Fla. 1992) ("Valid laws in effect at the time a contract is made enter into and become part of the contract as if expressly incorporated into the contract.").

Accordingly, a "statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract." Hassen v. State Farm Mut. Auto. Ins. Co., 674 So. 2d 106, 108 (Fla. 1996); Lumbermens Mut. Cas. Co. v. Ceballos, 440 So. 2d 612, 613 (Fla. Dist. Ct. App. 1983) ("It is well settled in Florida that the statute in effect at the time the insurance contract is executed governs any issues arising under that contract."). Also, "'the renewal of a contract of insurance constitutes the making of a new contract for the purpose of incorporating into the policy changes in the statutes regulating insurance contracts.'" Bell Care Nurses Registry, Inc. v. Cont'l Cas. Co., 25 So. 3d 13, 15 (Fla. Dist. Ct. App. 2009) (quoting Metro. Prop. & Liab. Ins. Co. v. Gray, 446 So.

8

2d 216, 218 (Fla. Dist. Ct. App. 1984)); May v. State Farm Mut. Auto. Ins. Co., 430 So. 2d 999, 1001 (Fla. Dist. Ct. App. 1983) ("It is the law in this state that a contract of annually renewable insurance forms a new contract at each renewal for the purpose of incorporating into the contract the statutory provisions enacted after the creation of the original contract relationship." (quotation marks omitted)).

Applying Florida law here, we must conclude that the statutory definition of "structural damage" contained in § 627.706(2)(k) governs the construction of the phrase "structural damage" in the Sheltons' policy.  The Florida legislature expressly stated that the statutory definition applies when the term "structural damage" is "used in connection with any policy providing coverage . . . for sinkhole losses."  Fla. Stat. § 627.706(2)(k) (emphasis added).   There is no dispute here that the statutory definition of "structural damage" in § 627.706(2)(k) was in effect when the Sheltons' policy was renewed in July 2011.  Thus, under Florida law, the statutory definition of "structural damage" is a part of the Sheltons' policy.

We recognize that the Sheltons' policy does not reference or contain the statutory definition of "structural damage."   But, under Florida law, the statutory definition "must be read into [the Sheltons' policy] just as if an express provision to that effect were inserted therein . . . ." Northbrook Prop. & Cas. Ins. Co., 765 So. 2d at 839 (quotation marks omitted).

9

Similarly, it is of little moment that Liberty Mutual and the Sheltons could have agreed to a different and broader definition of "structural damage" than the one provided in § 627.706(2)(k).  See, e.g., Green v. Life & Health of Am., 704 So. 2d 1386, 1391 (Fla. 1998) (holding that an insurer can agree to a different standard than the rigid statutory standard when the insurer "chose to draft and incorporate a different . . . standard in its application").  Liberty Mutual's policy, however, did not incorporate a different definition of "structural damage."  Under Florida law, the absence of an alternative definition means that the statutory definition fills the gap.  There is no indication in the policy that the parties intended to depart from the statutory definition.  See Northbrook Prop. & Cas. Ins. Co., 765 So. 2d at 839 (providing that all relevant and existing statutes become part of a contract, "except where the contract discloses a contrary intention" (quotation marks omitted)).

## B.    The Sheltons' Renewal Argument

We reject the Sheltons' argument that the statutory definition should not apply because their policy is a renewal policy and "Liberty Mutual failed to notify the Sheltons of the substantive changes to their insurance policy's sinkhole loss coverage."  Because the Sheltons had a policy with Liberty Mutual before the legislature added the definition of "structural damage" in May 2011, the Sheltons now contend that it was incumbent upon Liberty Mutual to notify them of the

10

legislative change when the Sheltons renewed the policy in July 2011.  We disagree.

The Florida legislature has provided concrete instructions with respect to renewal policies:  an insurer must give written notice to the insured when "[a] renewal policy . . . contain[s] a change in policy terms."  Fla. Stat. § 627.43141(2); see also Marchesano v. Nationwide Prop. & Cas. Ins. Co., 506 So. 2d 410, 413 (Fla. 1987) ("Absent a notice to the contrary, the insured is entitled to assume that the terms of the renewed policy are the same as those of the original contract.").  However, "the application of mandated legislative changes is not a change in policy terms."  Fla. Stat. § 627.43141(1)(a) .  As such, even assuming without deciding that the addition of the statutory definition of "structural damage" in § 627.706(2)(k) would otherwise constitute "a change in policy terms," the notice requirement of § 627.43141(2) is not triggered for this legislative change.

### III. CONCLUSION

Given our conclusion that the statutory definition applies to the term "structural damage" in the Sheltons' policy, we reverse the district court's grant of summary judgment in favor of the Sheltons and vacate the final judgment.  We

remand to the district court for further proceedings using the statutory definition of "structural damage" in § 627.706(2)(k).[4]

**REVERSED, VACATED, AND REMANDED.**

---

[4]Liberty Mutual did not appeal the district court's denial of its motion for summary judgment.