NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0450n.06

No. 20-3004

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Oct 04, 2021
DEBORAH S. HUNT, Clerk

|  |  |
|---|---|
| MAYBELLE Z. SMITH; MARY AGNES FLEMING, | ) ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| PAUL R. DASCHBACH, Trustee of the Estate of Mary Agnes Fleming; CHARLENE HELLYER, Executor of the Estate of Maybelle Z. Smith, | ) ) ) ) |
|  | ) |
| Plaintiffs-Appellants, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CONTINENTAL CASUALTY COMPANY dba CNA Insurance, | ) ) |
|  | ) |
| Defendant-Appellee. | ) |
|  | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

**OPINION**

BEFORE: ROGERS, NALBANDIAN, and MURPHY, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Plaintiffs Maybelle Smith of Ohio and Mary Fleming of Florida bought long-term care insurance policies from Continental Casualty Company ("CCC"). Plaintiffs paid a yearly premium. In return, CCC committed to paying them a daily benefit if they ever moved into a long-term care facility. Besides the premiums, the plans also required insureds to spend three days in a hospital before they could qualify for coverage. After Plaintiffs bought their policies, Ohio and Florida outlawed the sale of new policies with mandatory hospitalization requirements like those in Plaintiffs' contracts. Smith and Fleming eventually checked into long-

term care facilities, and CCC denied coverage because they hadn't completed the necessary hospital stays.

Plaintiffs objected, arguing that each annual premium they paid was consideration for a new year-long contract. And because their states had outlawed mandatory hospitalization provisions, those requirements did not apply to the contracts they'd entered since the legislation became effective. CCC argues that the requirements have remained in force, because Plaintiffs' annual premiums extended their initial policies, which they signed when such provisions were legal.

This case turns on whether Plaintiffs' original insurance plans continued in force from their effective dates or whether Plaintiffs entered a new policy with CCC every year. The contract terms show that the insurance policies have continued in force since their inception. Thus, the policies never incorporated the states' intervening prohibitions on mandatory hospitalization provisions. We **AFFIRM** the judgments below in favor of CCC.

## I. Background and Procedural History

*The Plaintiffs.* Maybelle Smith bought a long-term care insurance policy from CCC on or around February 25, 1988, her policy's effective date. She paid her annual premium every year. Once she could no longer live independently, she moved into Brookwood Retirement Community in Cincinnati, Ohio. After moving to Brookwood, Smith filed a claim for benefits. Although Brookwood was a qualified facility, CCC denied coverage because Smith had not met her policy's mandatory hospitalization requirement. She lived at Brookwood, until her death.

Like Smith, Mary Fleming bought a long-term care insurance policy from CCC on or around May 1, 1989, her policy's effective date. She paid her annual premium every year. Once she could no longer live independently, she moved into Stratford Court in Palm Harbor, Florida.

After moving to Stratford Court, Fleming filed a claim for benefits. Although Stratford Court was a qualified facility, CCC denied coverage because Smith had not met her policy's mandatory hospitalization requirement. She lived at Stratford Court, until her death.

*The Policies.* Plaintiffs' policies are nearly identical. Neither policy includes an end date. Instead, they have effective dates and "annual" terms; the policyholder's payment of the annual premium kept the policy "in force for the policy term." The policies are "guaranteed renewable for life." And Plaintiffs had the exclusive option to "renew this policy for further periods."

The policies cap Plaintiffs' "lifetime maximum benefit[s]" at a set number of days. Smith's policy pays out benefits for 1,500 days; Fleming's pays out for 2,555 days. Policyholders can spend down the lifetime maximums over multiple admissions to long-term care facilities.

CCC could not change any of the policies' substantive terms. And it could only increase the premiums if it gave Plaintiffs advance notice and if it equally raised the premium on every similarly rated policy in the state. CCC could not end the policies unless the policyholder failed to pay her premium. Smith's policy included a rider making it explicit that only she could end her policy.

The coverage remained in force at each Plaintiff's option. Premiums were due at the start of each policy term. But CCC accepted late premiums for a thirty-one-day grace period. Coverage ended if the policyholder did not pay the premium within the grace period. This rule was subject to one exception: CCC waived premiums due while a policy holder was on-claim. A policyholder who missed a payment and lost coverage could apply for reinstatement.

The policies guarantee their conformity with applicable state law as of their effective dates: "If any provision of this policy is in conflict with the statutes of the state in which you reside on the policy effective date, the provision is automatically amended to meet the minimum

requirements of the statute." ((R.12-1, Smith Policy, at PID#150; R.12-2, Fleming Policy, at PID#169).)

Assorted contract provisions limiting CCC's right to assert certain defenses use the effective date as a reference point. The policies cover undisclosed pre-existing conditions that eventually require long-term care unless the conditions require treatment during the policy's first six months. CCC cannot reduce or deny claims made within six months of the effective date for known conditions, unless the policy specifically excluded the condition from coverage. And once the policy has been in force for two years, CCC can no longer use a policyholder's innocent misrepresentations to deny a claim.

*Intervening Ohio and Florida Legislation.* Effective July 1, 1993, Ohio banned prior hospitalization requirements: "No long-term care policy shall . . . [c]ondition eligibility for any institutional benefits on a requirement of prior hospitalization." Ohio Rev. Code Ann. § 3923.44(E)(1)(a). This legislation applied only to "long-term care insurance policies . . . delivered or issued for delivery in this state *on or after the effective date*." Ohio Admin. Code § 3901-4-01(C). It also prevented long-term care insurers from "cancel[ing], nonrenew[ing], or otherwise terminat[ing]" a policy "on the grounds of the age or the deterioration of the mental or physical health of the insured individual." Ohio Rev. Code Ann. § 3923.44(B)(1).

Florida got to the same place Ohio did, but it took two statutes. In 1988, Florida banned long-term care insurance contracts that required a mandatory hospitalization stay of longer than three days. Long-Term Care Insurance Act, ch. 88-57, §§ 1, 1988 Fla. Laws 305, 310 (1988) (codified as amended at Fla. Stat. § 627.9407 (2020)). That first statute "appl[ied] to policies issued or renewed on or after" "October 1, 1988." *Id.* Less than a year later, the State clarified the retroactive effect of most of its new minimum requirements for long-term care insurance.

It indicated that these requirements apply only to those policies "delivered or issued for delivery" after October 1, 1988. Act of June 28, 1989, ch. 89-239, § 1, 1989 Fla. Laws 1015, 1015 (codified as amended at Fla. Stat. § 627.9403 (2020)).

In 1992, Florida went further and altogether banned the issuance of new contracts with any mandatory hospitalization provisions. "A long-term care insurance policy may not be delivered or issued for delivery in this state if the policy . . . [c]onditions eligibility for any benefits on a prior hospitalization requirement." Fla. Stat. § 627.9407(5)(a). The same legislation also outlawed bundling provisions. These provisions denied home healthcare benefits to claimants who had not also bought therapeutic or nursing services. Fla. Stat. § 627.94071(2). All of these changes became effective on October 1, 1992, and the governing statute limited their application to policies "delivered or issued for delivery." Act of Mar. 24, 1992, ch. 92-33, § 146, 1992 Fla. Laws 383, 385 (codified as amended at Fla. Stat. § 627.9407 (2020)). This new legislation also forbade insurers from cancelling long-term care insurance policies "on the grounds of the age or the deterioration of the mental or physical health of the insured individual or certificate holder." Fla. Stat. § 627.9407.

*Smith's Riders and Premium Increases.* In 1998 and 2004, CCC raised Smith's premiums. In full, the 1998 Rider reads:

> It is hereby agreed that the renewal premium for policy No.:076255208 is $545.46. Nothing in this rider shall affect the mode of premium for this policy.
>
> This rider takes effect for the policy to which it is attached on the first premium due date on or after February 25, 1999.

(R.12-1, Smith Policy, at PID#155.) The correspondence alerting Smith to her 2004 premium increase simply advised her that "the premium you currently pay annually will increase on the first

premium due date on or after February 25, 2004. Your new annual premium will be $763.64 and will be reflected on your next premium due notice." (*Id.* at PID#156.)

*Procedural History.* After CCC denied coverage, Plaintiffs sued. Their complaint included multiple claims, including for breach of contract in both Ohio and Florida. The district court dismissed Smith's claims with prejudice and awarded summary judgment to CCC on Fleming's claim.[1]

Plaintiffs appealed. Their opening brief only addresses their breach of contract claims, so we review only those arguments. *See Hih v. Lynch*, 812 F.3d 551, 556 (6th Cir. 2016) ("An appellant abandons issues not raised and argued in his initial brief on appeal.").

## II. Standard of Review

We review the district court's dismissal of Smith's complaint under Federal Rule of Civil Procedure 12(b)(6) de novo. *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 793 (6th Cir. 2016). Smith's complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not [state a plausible claim]." *Id.* at 678.

We review the district court's grant of summary judgment on Fleming's claim de novo, examining the entire evidentiary record for a genuine issue of material fact. *Jackson v. Genesee Cnty. Road Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021). If a genuine issue of material fact exists,

---

[1] After the trial court dismissed Smith's claims under Ohio law, Smith moved for certification of the contract issue to the Ohio Supreme Court. The trial court denied that request. Neither party has made a similar certification request to either the Ohio or the Florida Supreme Court in its appellate briefing.

we must reverse the grant of summary judgment. *See id.* We review the evidence in the light most favorable to the nonmoving party, here, Fleming. *Id.*

### III. Analysis

#### A. Plaintiff Smith

##### 1. Smith's Original Contract[2]

Ohio courts interpret insurance policies according to their plain language. *See Saunders v. Mortensen*, 801 N.E.2d 452, 454 (Ohio 2004). A contract's plain language is the best evidence of the parties' intent. *Beverage Holdings, LLC v. 5701 Lombardo, LLC*, 150 N.E.3d 28, 31–32 (Ohio 2019). The contract is to be read as a whole, giving effect to as many provisions as reasonably possible. *Saunders*, 801 N.E.2d at 455.

Contracts sometimes include options to renew or options to extend. *State ex rel. Preston v. Ferguson*, 166 N.E.2d 365, 371–72 (Ohio 1960). If a party exercises its option to extend the contract, then the original contract continues in force for the extended term. *Id.* To renew a contract, on the other hand, the parties must execute a new contract. *See id.*

Whether the parties have renewed or extended a contract determines whether the contract incorporates legislation passed since the parties entered the original contract. Any law that became effective after the parties entered an insurance policy will apply to a renewal of that policy. *Id.* An extended contract, however, continues in force under its original terms, unaffected by intervening legislation. *Id.*

---

[2] Smith's appeal concerns Ohio contract law, while Fleming's focuses on an arguably controlling Florida precedent. Although this section focuses on Smith because that is how Plaintiffs briefed and argued their case, Fleming's policy contains all the provisions discussed in this section.

In Ohio, courts presume that lengthening the term of a contract is an extension, not a renewal. *Med. Life Ins. Co. v. Lamar*, No. 00AP-201, 2000 WL 1911665, at *4 (Ohio Ct. App. Jan. 9, 2000) ("[A] court must presume that the parties intended the law, which was in effect when they first entered into the contract, to govern the contract throughout its existence."). A contract must make clear that the parties intended any additional terms to be renewals, rather than extensions, to defeat this presumption. *Barry v. Cincinnati Ins. Cos.*, No. 01AP-1437, 2002 WL 31087264, at *3 (Ohio Ct. App. Sept. 19, 2002). Although, as far as we can tell, the Ohio Supreme Court has never adopted this presumption, it follows from generally accepted insurance law principles. *See* 2 Steven Plitt et al., Couch on Insurance § 29:35 (3d ed. 2021) ("In the absence of a clear provision in the policy defining the nature of the renewal, some courts regard the renewed or renewal contract as though it were merely a continuation or extension of the original contract.").

Plaintiff Smith argues that she entered a new contract with CCC every time she paid her premium. This being so, when she paid her first premium after Ohio abolished mandatory hospitalization requirements, that requirement was no longer a part of her policy. Smith asserts that the contract's terms and renewal language, along with CCC's premium increases, dictate this conclusion.

CCC responds that no contract term, premium increase, or subsequent rider created a new contract subject to the intervening legislation. Smith's only contract with CCC became effective in February 1988, and it has operated ever since.

So the issue is whether Smith's later premiums were consideration for new, year-long contracts subject to the intervening Ohio legislation, or for year-long extensions of her original contract. If they were extensions, CCC wins because Smith's policy never incorporated Ohio's

ban on mandatory hospitalization provisions. But if they were renewals, then Smith wins because CCC could not lawfully have enforced the mandatory hospitalization provision.

Smith's arguments for why her contract renewed every year are unavailing. She makes three, and we address each in turn. First, she argues that four Ohio cases, each of which concerns a policy "'guaranteed renewable' upon payment of the renewal premium," represent persuasive authority for how to interpret Smith's contract. Second, she points us to policy provisions that arguably suggest each of her premium payments is only consideration for a single, year-long term of coverage. Third, she drills down on the words "renew" and "annual." We consider her cited cases first.

*Smith's Ohio Cases.* Smith cites four Ohio cases that, she claims, prove polices that are "'guaranteed renewable' upon payment of the renewal premium" form new contracts every time the insured pays a premium. But none of these cases discusses a "guaranteed renewable *for life*" policy. (R.12-1, Smith Policy, at PID#144 (emphasis added).) In each of Smith's cases, the insurer could terminate the contract at the end of a predetermined term. *Benson v. Rosler*, 482 N.E.2d 599, 602 (Ohio 1985) (per curiam) ("The policy may be renewed . . . each time the company offers to renew[.]"); *Barry*, 2002 WL 31087264, at *4 (policy explicitly empowered insurer "not to renew this policy," which "indicate[d] an intent that the . . . policy be renewed, not extended, upon option of the parties"); *Dixon v. Pro. Staff Mgmt.*, No.01AP-1332, 2002 WL 2005689, at *6 (Ohio Ct. App. Sept. 3, 2002) (finding the insurer's right to terminate "significant" since it "indicate[d] separate contracts of insurance rather than a continuing policy"); *Francis v. McClandish*, No.98CA21, 1999 WL 266680, at *7 (Ohio Ct. App. Apr. 19, 1999) (insurer's limited renewals lasted only "until August 30, 1996"). Even that limited ability to cancel coverage distinguishes the policies in those cases from Smith's "guaranteed renewable for life" policy. There is nothing

"guaranteed" about these arrangements, which let insurers decide whether to end coverage on specified dates.

In contrast, CCC is powerless to end its contract with Smith. (*See* R.12-1, Smith Policy, at PID# 144 (CCC "guarantee[s] to renew [Smith's] policy as long as the premium is paid within the allowable time.").) As long as Smith timely pays her premium, she keeps her coverage. This is unsurprising; giving insureds the exclusive ability to end their guaranteed renewable for life coverage is the hallmark of long-term care insurance policies, making them distinct from home or automobile policies. *See, e.g.*, *Walker v. Conseco Servs., LLC*, No. 3:02-CV-7245, 2003 WL 403181, at *5–6 (N.D. Ohio Feb. 24, 2003); *Yoder v. Am. Travellers Life Ins. Co.*, 814 A.2d 229, 233 (Pa. Super. Ct. 2002); *Haley v. AIG Life Ins. Co.*, No. A2-01-49, 2002 WL 417419, at *3–4 (D.N.D. Jan. 24, 2002); *Oates v. Equitable Assurance Soc'y*, 717 F. Supp. 449, 452 (S.D. Miss. 1988); *Hudson v. Rsrv. Life Ins. Co.*, 141 S.E.2d 926, 927–28 (S.C. 1965); *see also* Couch on Insurance § 29:35 ("Where the policy of insurance is in a sense 'automatically' renewed when the insured pays an additional premium, the parties are deemed bound by the original contract of insurance."). It is precisely the insurer's reservation of its ability to cancel coverage that has led courts to find that certain long-term care insurance policies are serialized year-long contracts rather than indefinite. *See, e.g.*, *Bushnell v. Medico Ins. Co.*, 246 P.3d 856, 862 (Wash. Ct. App. 2011); *Coliseum House, Inc. v. Brock*, 442 So. 2d 778, 781 (La. Ct. App. 1983); *Moore v. Metro. Life Ins. Co.*, 307 N.E.2d 554, 557 (N.Y. 1973).

This exclusive option to renew also reflects the different structure of long-term care insurance, as compared with Smith's cited cases. *Benson*, 482 N.E.2d at 602 (automobile); *Barry*, 2002 WL 31087264, at *4 (homeowners); *Dixon*, 2002 WL 2005689, at *1 (homeowners); *Francis*, 1999 WL 266680, at *1 (automobile). Homeowners and automobile policies provide

immediate coverage for a set term, after which the insurance companies can decide on a new rate to charge every individual insured. These changes can reflect what the actuaries have learned about the insured's driving habits or neighborhood during the previous term. Oral Arg. at 22:06-52. But long-term care insurance is a "long-tail contract"; it provides indefinite coverage that the insured is unlikely to use soon. The younger a policyholder is who purchases it, the less risky class of policyholders she'll be placed in, and her premium will be lower because she isn't expected to claim benefits until years later. Oral Arg. at 14:10-23. This long-tail structure is common in long-term care insurance "to ensure coverage as [policyholders] grow older and are more likely to need it." *Walker*, 2003 WL 403181, at *6; *see also Haley*, 2002 WL 417419, at *4.

This "guaranteed renewable for life" arrangement provided both Smith and CCC with important protections. Smith would never have to undergo another underwriting process or reapply for coverage. Either of these processes could have caused her to be assigned to a class of policyholders with higher premiums. And once her policy had been in effect for long enough, CCC couldn't deny her claims based on certain pre-existing conditions or Smith's innocent representations. In return, CCC's long-term care policies were protected from intervening legislation. This security allows insurers to project their obligations into the future and ensure they can pay the benefits claims they receive.

If the parties had to go through the formal steps of contract formation each year—offer, acceptance, consideration—CCC could just refuse to extend or accept an offer to continue coverage. To be fair, Ohio forbids "nonrenew[al]" because of an insured's "age or the deterioration of [her] mental or physical health." Ohio Rev. Code Ann. § 3923.44(B)(1). But this does nothing to prevent CCC from dropping insureds who haven't yet shown their age. Smith's view seems to allow CCC to pocket premiums from healthy thirty-year-olds for a few years before

refusing to renew their policies. This would force policyholders to reapply for coverage on less favorable terms. Alternatively, there is no law against CCC exercising its business judgment and leaving the long-term insurance market altogether. CCC might even choose to do so after new legislation, like a ban on certain provisions, reshaped the market. This case offers a prime example. CCC's counsel represented at oral argument that CCC has stopped selling long-term care insurance. *See* Oral Arg. 27:03-14. The "guaranteed renewable for life" nature of her policy protected Smith from both CCC's business judgment and any reclassification of her policy as she ages.

It also explains why the policy has no end date. End dates in term policies limit the time during which the insurer is responsible for a claim. *Francis*, 1999 WL 266680, at *8 ("[T]he insurance policy terminates upon the end of each policy period[.]"); *Dixon*, 2002 WL 2005689, at *6 ("[T]he policy periods begin and end at 12:01 a.m. Standard Time at the residence premises for 12 months beginning and ending on May 21."); *see* Couch on Insurance § 29:33 ("[W]here a policy clearly stated that it terminated at the end of the policy period, a new contract with a new effective date was created each time the policy was renewed."). It makes sense that there is no predetermined end date in Smith's contract, because it ended only if she declined to pay her premium. Smith's quartet of Ohio cases only sharpens the contrast between her "guaranteed renewable for life" plan and the term policies at issue in her cited cases.

Likewise, Smith's Ohio cases don't consider contracts that are guaranteed renewable *for life*. The insurers in her cited cases can escape their obligations at predesignated times. And, in the long-term care context, courts have consistently recognized whether the insurer can cancel coverage as a dividing line between extended contracts and renewed contracts. The extension of long-term care insurance policies provides both Smith and CCC with certain protections that they

12

would either lose or not need if their contract periodically renewed. In sum, Smith's automobile and homeowners insurance cases don't provide much guidance on how we ought to interpret her long-term care insurance policy.

Properly understood, CCC's argument is not that long-term care insurance policies should be interpreted differently than homeowners and automobile insurance policies. Rather, because these policies aren't "guaranteed renewable for life," they are different in kind and not persuasive comparisons. *See Haley*, 2002 WL 417419, at *4 (finding cases discussing term insurance policies "inapplicable").

*Selected policy provisions.* Smith next focuses on isolated provisions in her policy that, she argues, suggest she entered a new contract every year for one year of coverage. She notes that the initial premium keeps "[Smith's] policy in force for *the* Policy Term." (R.12-1, Smith Policy, at PID#144 (emphasis added).) And her premiums extend coverage "*for further periods*." (*Id.* (emphasis added).) These provisions, and the fact that premiums "are due at the start of *each* Policy Term" all suggest, Smith argues, that she is entering a series of year-long contracts with CCC. (*Id.* at PID#149 (emphasis added).)

But her policy, read as a whole, confirms that the parties intended for their agreement to last longer than a year. For starters, the "keeps" "in force" language explicitly cuts against her. Couch on Insurance § 29:33 ("[T]he rule that a renewal policy constitutes a separate and distinct contract for the period of time covered by the renewal *does not apply* where the extension agreement shows a contrary intention as by stipulating that the original agreement 'continues in force.'" (emphasis added)).

Second, Smith's interpretation would thwart three of the limitations provisions in her policy. Consider the innocent misstatements limitation. For the first two years, CCC can deny

coverage based on a claimant's innocent misrepresentations in her application. CCC then loses this power. But if Smith's interpretation is correct, the protection would never vest—a one-year contract cannot remain in force for two years. *See Hudson*, 141 S.E.2d at 928. And if CCC could always invoke this defense, the innocent misstatements limitation would be meaningless. *See Saunders*, 801 N.E.2d at 455 (where reasonable, courts give effect to every provision).

Two other limitations provisions bedevil Smith's interpretation. The first allows CCC to deny certain claims in the first six months of coverage. During that time, CCC can deny Smith coverage for claims linked to an undisclosed pre-existing condition. Alternatively, CCC can deny Smith coverage for claims linked to health conditions that CCC knew about and chose not to exclude from coverage if the care begins within ninety days of the policy's effective date. But, as with the two-year limitation, these shorter limitations don't make sense if CCC and Smith are entering a series of one-year contracts. If that were right, CCC could explicitly exclude additional conditions from coverage every year, slowly stripping Smith of the coverage she'd originally bargained for. Plus, CCC could deny coverage based on her pre-existing conditions for a portion of any given year. In sum, all three of the limitations provisions in Smith's contract create irreconcilable tension with her preferred interpretation.

Third, Smith's contract waives her premium if it comes due while she is on-claim once she has been in qualified care for ninety consecutive days. That waiver is effective until she either exhausts her lifetime maximum benefit or is discharged. After a discharge, the policy requires Smith to "make premium payments when due" to keep her policy. But that's an odd requirement under Smith's interpretation; why can't she and CCC just sign a new contract off-cycle? Surely, CCC would like to accept the next premium as soon as possible, especially if it meant that all future annual premiums would also be due sooner.

Fourth, the policy's "reinstatement" provision presents a similar problem. If she and CCC had been entering a series of year-long contracts, there would be no need for "reinstatement" of some original policy. *See Hudson*, 141 S.E.2d at 927–28 (citing an accident and health insurance policy's reinstatement provision as evidence "that the parties contemplated continuous coverage, rather than successive independent contracts" and viewing that provision as "inconsistent with the view that the policy terminated on each premium paying date"). They would just sign a new one.

Fifth, Smith's policy has a lifetime maximum benefit of almost five years—1,500 days. Imagine she spends two years, or 730 days, on-claim, and then she is discharged. She dutifully pays her next premium. Has her lifetime maximum benefit been reset to 1,500 days? Or does she only have 770 days remaining? The answer is the latter. The whole point of a lifetime benefit cap is that it stretches over the policyholder's lifetime.

The maximum benefit's reference to a "lifetime" is hard to reconcile with Smith's position. Rather, if CCC were entering one-year contracts with each of its insureds, we would expect each policy to simply cover a stay of up to 1,500 days. Instead, the policy explicitly contemplates that a policyholder may go on-claim more than once, spending down her lifetime benefits across multiple admissions to long-term care facilities. So it makes sense for the premium payments to restart after a discharge. The policyholder is entitled to the rest of her 1,500 days, if she still wants it. (That's what she's been paying for, after all.)

Sixth, CCC bargained for the limited right to raise Smith's premiums. Again, this limitation makes little sense if Smith and CCC were entering new contracts each year as an original matter. Instead, the conditions on CCC's ability to raise premiums displays an intent that this contract would govern the parties' relationship into the future and for as long as Smith wanted.

As opposed to Smith's reading, CCC's interpretation makes quick and convincing work of each tension. Long-term care insurance policies protect insureds for the long term, not for a year. This explains why Smith's premiums keep her existing policy "in force." This explains why the limitations provisions vest within two years and remain effective for the life of the policy. This explains why insureds must resume paying their bargained-for premiums after discharge from a long-term care facility to keep their coverage. This explains why the policy allows for reinstatement rather than require reapplication. This explains why the policy contemplates a "lifetime" of benefits. And this explains why CCC's ability to set next year's premium is not absolute, as it would be during a fresh contract negotiation. Taken together, Smith's policy's provisions make clear that the parties intended their contract to extend indefinitely.

*"Renew" and "Annual."* Smith's next argument is even narrower, focusing not on isolated provisions but on isolated words: "renew" and "annual." She argues the policy's use of "renew," rather than "extend," means the contract is being renewed under Ohio law. But "renewal" and "extension" are legal concepts that determine whether the parties have entered a new contract. *Lamar*, 2000 WL 1911665, at *4–5; *see also* Couch on Insurance § 29:33 ("Whether the renewal of a policy constitutes a new and independent contract or continuation of the original contract primarily depends upon the intention of the parties as ascertained from the instrument itself."). Ohio courts don't mechanically hold that the use of either term controls the policy's interpretation. *Cf. Lamar*, 2000 WL 1911665, at *4. Instead, they read the contract as a whole, giving effect to each of its provisions. *Saunders*, 801 N.E.2d at 455. And here, a thorough review of the contract as a whole shows that the parties intended a single continuous contract.

Smith's focus on "annual" is similarly unpersuasive. She argues that an annual contract is the same as a year-long contract. But "annual" and "year-long" are not synonyms. Something

16

annual happens once every year, but a year-long event continues over a year before ending. *Compare* Webster's New World College Dictionary 58 (5th ed. 2020) (defining "annual" as "happening or appearing once a year"), *with id.* at 1677 (defining "year-long" as "continuing for a full year"). A birthday is an annual occurrence, for example, but centennial celebrations often feature multiple events spread over a year. Smith's attempt to conflate the two fails.

Ultimately, Smith's argument that the parties intended the original contract to last only a year fails. Consider, in totality, what Smith argues does and does not happen every year when she pays her premium. Her limitations periods don't restart. Her lifetime maximum benefits don't reset. Neither she nor CCC can renegotiate any term of her policy. Yet on her premium's due date each year (presumably even if she is on-claim and the premium is waived), Smith argues that she entered a new contract, which incorporated intervening legislation. Even if there were no presumption in favor of extension, see *Barry*, 2002 WL 31087264, at *3; *Lamar*, 2000 WL 1911665, at *4, this position is unconvincing as an original matter.

Smith's last argument is that her policy is ambiguous on this point, and that ambiguity must be construed against the insurer. But, as we've explained, her contract is not ambiguous on this point, so that rule doesn't apply. "Although ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured, it is equally well-settled that a court cannot create ambiguity in a contract where there is none." *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) (citation omitted).

### 2. CCC's Subsequent Correspondence with Smith

Smith also contends that the letters CCC sent her when it raised her premiums suggest that the parties formed new contracts at those times. After all, she argues, language related to contract formation suggests the parties intended for renewals rather than extensions. *See Benson*, 482

N.E.2d at 602 (finding that the parties renewed an insurance policy where the policyholder could "accept" the insurer's "offer to renew"). So Smith argues that the 1998 Premium Adjustment Rider's statement that the parties "hereby agreed" to the higher premiums is evidence of a new contract.

But prefatory language in a form document does not necessarily have legal effect. *See Cleveland Tr. Co. v. Snyder*, 380 N.E.2d 354, 359 (Ohio Ct. App. 1978) (refusing to give prefatory language describing a woman as an "undersigned (Cardholder)" legal effect because she never applied for a card); *Aho v. Cleveland-Cliffs, Inc.*, 219 F. App'x 419, 422 (6th Cir. 2007) ("Ohio courts have held that prefatory language . . . cannot alone create contractual obligations.").

So Smith and CCC did not "agree" to a new premium rate. CCC exercised its preexisting, bargained-for right to raise Smith's premium. So the rider's use of "hereby agreed" does not create a new contract taking effect "on or after February 25, 1999." And the rider itself says it "takes effect for the policy to which it is attached on the first premium due date on or after February 25, 1999." The new *premium* becomes effective on that date, not a new *policy*. *See Yoder*, 814 A.2d at 233 ("[T]o form a contract, there must be an offer, an acceptance, and consideration. Here, the offer which established the terms of the contract was the Insurers' offer in 1989 to provide noncancelable insurance, at potentially increasing rates . . . for as long as [plaintiff] paid the premiums.") (citation omitted). CCC's bargained-for premium increase took effect within the existing contract's terms.

Smith's second and final argument about the riders relates to the 2003 Premium Adjustment Notice. She observes that both the amended notice's "renewal premium" and "first premium" are set at $763.64, higher than Smith's original premium of $431.20. She had been paying CCC premiums for more than a decade by this point. So that her upcoming premium was

a "first premium" must mean that it is the first premium on a new policy, "or else the word 'first' has lost its normal meaning." (Appellants' Br. at 38.)

Not so. The district court noted that CCC didn't issue a new policy number, suggesting the original policy remained in force. (R.21, Order Granting Mot. to Dismiss in Part, at PID#217); *see Francis*, 1999 WL 266680, at \*8 (considering the issuance of a new policy number as evidence of a new contract). The schedule is also described as "amended." Unless the original contract was still in force, there would have been nothing to amend. Instead, a clean policy schedule would've come with the new contract. And of course, Smith's premiums were always subject to increase.

What's more, the "first premium," which "keeps [the] policy in force for the Policy Term," and the "renewal premium," which allowed Smith to "renew this policy for further periods," serve different functions. (*Id.*) This distinction would become important if CCC gave policyholders advanced notice about a premium increase to take effect more than a year in the future. If that happened, the numbers would diverge because the next premium due (the "first premium") would be less than the premiums due further into the future (the "renewal premium"). So although the use of "first" is admittedly awkward, given its defined function, nothing about it suggests the parties have entered a new contract. *Cf. Sutton Bank v. Progressive Polymers, LLC*, 163 N.E.3d 546, 552–53 (Ohio 2020).

We affirm the district court's dismissal of Smith's claim.

B. **Plaintiff Fleming**

Fleming's sole argument on appeal is that an intermediate Florida state-court case is controlling precedent. *Bell Care Nurses Registry, Inc. v. Continental Casualty Company*, 25 So. 3d 13 (Fla. Dist. Ct. App. 2009), involved a "guaranteed renewable for life" long-term care insurance policy with a home health care benefit. *Id.* at 15. Plaintiff bought the policy in 1990

and could renew it every six months. *Id.* at 14–15. The policy did not cover claims for home health care benefits unless the claimant was already receiving nursing or therapeutic services. *Id.* at 14. We'll call this a bundling provision. In 1992, Florida outlawed the issuance of new polices with these provisions. *Id.* at 15. Insurers could no longer issue policies conditioning home healthcare benefits on the purchase of other services. Fla. Stat. § 627.94071(2); *see Bell Care*, 25 So. 3d at 15. That plaintiff argued, like Fleming does here, that his ongoing, regular premium payments were new contracts that incorporated new legislation. *Id.* at 15–16. The appellate court agreed. These facts track ours insofar as CCC issued both policies in Florida, both were for long-term care insurance, both were described as "guaranteed renewable for life" for successive terms, and both were subject to increasing premiums.

We are "obligated" to rule how we think the Florida Supreme Court would if it faced this issue. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). The Florida Supreme Court reviews contract interpretation de novo. *Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017). We owe intermediate state court decisions "some weight." *Comm'r of Internal Revenue v. Est. of Bosch*, 387 U.S. 456, 465 (1967) (citation omitted). But "[f]aithful application of a state's law requires federal courts to anticipate how the relevant state's highest court would rule." *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 607 (6th Cir. 2012) (citation and internal quotation marks omitted).

We analyze Fleming's argument in three steps. First, we explore whether *Bell Care* has precedential effect on this case. After concluding that it does not, we consider the opinion's reasoning as an original matter. We analyze both its interpretation of the governing statutes and

treatment of relevant out-of-state cases. Finding neither analysis persuasive, we conclude that the Florida Supreme Court would decline to follow *Bell Care*.

*Precedential Value*. "To be of value as a precedent, the questions raised by the pleadings and adjudicated in the case cited as a precedent must be [o]n point with those presented in the case at bar." *See Speedway SuperAmerica, LLC v. Tropic Enters., Inc.*, 966 So. 2d 1, 3 (Fla. Dist. Ct. App. 2007) (quoting *Twyman v. Roell*, 166 So. 215, 217 (Fla. 1936)). *See also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J. dissenting) ("Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed."). So any precedential effect that *Bell Care* has is limited to the arguments it resolved.

Here, although there are similarities between *Bell Care* and this case, that court did not grapple with the specific contract provisions that we are analyzing. Thus, *Bell Care* sheds no light on CCC's arguments about Fleming's contract's structure. The opinion only notes that the plaintiff's policy gave him the option to renew his policy by paying another semi-annual premium. *Bell Care*, 25 So. 3d at 16. There is no mention of any of the provisions in Fleming's policy that reflect the parties' intent that it last into perpetuity: the limitations-of-defenses provisions, the waiver of premiums while on-claim, reinstatement, a maximum lifetime benefit, and the limitations on CCC's ability to raise premiums. *See supra* at 14–17. So *Bell Care* provides no guidance on how future courts ought to construe these provisions.[3] We need not defer to a decision that wouldn't even bind future panels of the court that produced it if they heard our case. Fleming's policy presents the "clear vision of one continuous contract" that *Bell Care* found wanting. *Bell Care*, 25 So. 3d at 17.

---

[3] Perhaps the *Bell Care* policy was identical to the policy here. But the key fact is that the *Bell Care* court does not discuss any of the provisions that CCC emphasizes and that we find controlling.

Shorn of precedential authority, we consider *Bell Care*'s treatment of the relevant statutory scheme for its persuasive force. "[I]t is generally accepted that the statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract." *de la Fuente v. Fla. Ins. Guar. Ass'n*, 202 So. 3d 396, 403 (Fla. 2016) (citation omitted). "The general rule is that in the absence of clear legislative intent to the contrary, a law affecting substantive rights, liabilities[,] and duties is presumed to apply prospectively." *Metro. Dade Cnty. v. Chase Fed. Hous. Corp.*, 737 So. 2d 494, 499 (Fla. 1999). "Thus, if a statute attaches new legal consequences to events completed before its enactment, the courts will not apply the statute to pending cases, absent clear legislative intent favoring retroactive application." *Id.*

When the *Bell Care* plaintiff bought his policy, Florida's minimum requirements for long-term care insurance applied to policies "issued or renewed" after a specific date. *Bell Care*, 25 So. 3d at 17. That's correct. But *Bell Care* then concludes that Florida's later-passed, stricter minimum requirements—like the prohibition on bundling provisions—also applied to renewed policies. We respectfully disagree and think the Florida Supreme Court would as well.

*Statutory History*. Consider the state's long-term care insurance at three points in time. Before 1988, insurance companies could include mandatory hospitalization requirements of any length in their policies. *See* Long-Term Care Insurance Act, ch. 88-57, § 1, 1988 Fla. Laws 305 (1988) (codified as amended at Fla. Stat. §§ 627.9402–08 (2020)) (Florida's first long-term care insurance statute passed, in part, "to establish standards for long-term care insurance"). And there was no ban on bundling provisions. *See id.*

But beginning in 1988, insurance companies could only "issue or renew" policies with mandatory hospitalization requirements of three days or less. *See id.* § 1, 1988 Fla. Laws at 310–11 (applying the three-day limit on mandatory hospitalization requirements to policies "issued *or*

*renewed* on or after" October 1, 1988) (emphasis added). Fleming and the *Bell Care* plaintiff bought their policies during this time. Fleming's included a three-day mandatory hospitalization provision. And the *Bell Care* policy contained a bundling provision. *Bell Care*, 25 So. 3d at 14.

In 1992, Florida further tightened its laws on long-term care insurance. It banned both mandatory hospitalization provisions and bundling provisions. Fla. Stat. § 627.9407(5)(a) (mandatory hospitalizations); *id.* § 627.94071(2) (bundling); *see generally* Act of Mar. 24, 1992, ch. 92-33, §§ 146–51, 1992 Fla. Laws 383 (codified as amended at Fla. Stat. §§ 627.9407–94072 (2020)). By that time, Florida had begun applying its minimum requirements for long-term care insurance to policies "delivered or issued for delivery." Fla. Stat. § 627.9403; *see* Act of June 28, 1989, ch. 89-239, § 1, 1989 Fla. Laws 1015, 1015 (codified as amended at Fla. Stat. § 627.9403 (2020)).

We presume this change from "issued or renewed" to "delivered or issued for delivery" was consequential. *See Smith v. Fla. Dep't of Corrs.*, 961 So. 2d 1050, 1052 (Fla. Dist. Ct. App. 2007) (citing *Mikos v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.*, 497 So. 2d 630, 633 (Fla. 1986)). Two features stand out to us. First, the legislature removed the word "renewed" altogether. That omission shielded existing long-term care insurance contracts from the newer, stricter requirements. *See Yoder*, 814 A.2d at 233 (concluding that the omission of "renewals" from the statute regulating long-term care insurance was "dispositive" evidence that the legislature did not want the later-passed legislation to supersede existing policy terms).[4]

---

[4] Acknowledging this legislative change does not create any tension with our Ohio law analysis. Ohio courts distinguish between contract extensions and contract renewals. *See Preston*, 166 N.E.2d at 371–72. But the formal distinction between renewals and extensions is a creature of Ohio's contract law. Although this reflects a widely accepted principle of insurance law, the legal terms "renewal" and "extension" are specific to Ohio. *See* Couch on Insurance § 29:34 (explaining that a "renewal" can alternatively "result[] in a new contract or merely continue[] the old one in existence"); *id.* § 29:35 (using the terms "continuation" and "extension"

23

Second, multiple provisions in Florida's insurance code retain the word "renewal." The legislature passed many of these after the laws at issue here. *See, e.g.*, Fla. Stat. § 627.9407(3)(a) (allowing state regulators to authorize the nonrenewal of long-term care insurance policies if renewal would jeopardize the insurer's solvency); *id.* § 627.6409 (requiring health insurance policies "issued, amended, delivered, or renewed in this state after October 1, 1996" to cover medically necessary diagnosis and treatment of osteoporosis for high-risk individuals); *id.* § 627.6691 (same for group, blanket, or franchise health insurance policies); *id.* § 627.64197 (prohibiting health insurance policies "issued, delivered, or renewed on or after July 1, 2020" that cover organ transplants on an expense-incurred basis from denying coverage based on the insured's disability). At least one added a requirement to existing long-term care insurance policies. *Id.* § 627.94073(2) (requiring insurers of long-term care insurance "policies issued or renewed on or after October 1, 1996" to notify policyholders at least once a year of their right to designate a second addressee).

The Florida Supreme Court "presume[s] that the Legislature acts purposefully when it removes language from one statute, but leaves identical language in a different statute." *Wright v. City of Miami Gardens*, 200 So. 3d 765, 773 (Fla. 2016). So we are confident it would give independent meaning to the legislature's disparate use of "renew." *See id.* ("When the [L]egislature has used a term, as it has here, in one section of the statute but omits it in another section of the same statute, we will not imply it where it has been excluded.") (alteration in original) (citation omitted). *See* William N. Eskridge Jr., *Interpreting Law* 124–27 (2016);

---

interchangeably). The term "renewal," then, in the 1988 statute could have been limited to the meaning Ohio gives it or it could have covered both of what Ohio would define as "renewals" and "extensions." But either way, as the statutory history makes clear, Florida's 1992 ban on mandatory hospitalization provisions did not apply to Fleming's 1989 policy.

24

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–73 (2012).

The distinction has practical consequences. Some new requirements, like the bans on mandatory hospitalization provisions or bundling provisions, don't apply to policies renewed after 1992. But others, like the yearly requirement to prompt the policyholders to designate a second addressee, do apply to those policies. *See* Fla. Stat. § 627.94073(2). It depends on whether the legislature applied a particular requirement to policies "renewed" after 1992.

To recap, when Florida's legislature banned mandatory hospitalization provisions and bundling provisions, it limited its restrictions on long-term care insurance to policies "delivered or issued for delivery." *Id.* § 627.9403. But it has used "renewed" for other new insurance requirements since the bans, including at least once for long-term care insurance policies. This textual discrepancy is convincing evidence that the 1992 prohibitions on mandatory hospitalization provisions and bundling provisions did not apply to policies issued before they become law.

Fleming's policy was already in force when the 1992 amendments banning mandatory hospitalization provisions passed. The legislature limited that new requirement's application to policies "delivered or issued for delivery." The new requirement, by the statute's own terms, did not apply to policy renewals. In sum, Florida outlawed mandatory hospitalization requirements shortly after it stopped applying new, stricter requirements to renewed policies. So CCC's denial of Fleming's claim for failure to fulfill her three-day hospitalization requirement was not a breach of contract.

Bell Care*'s Reasoning*. *Bell Care*'s treatment of the relevant cases fares no better than its treatment of the statutes. The *Bell Care* court finds coverage, in part, by claiming to distinguish two other long-term care insurance cases from other jurisdictions, *Moore* and *Oates*. But its

25

discussion of *Moore v. Metropolitan Life Insurance Company*, 307 N.E.2d 554 (N.Y. Ct. App. 1973), misstates Florida law. The court favorably cites *Moore*'s observation that "where, as here, an insurer has the absolute right . . . to change the insurance premium rate without the State's consent, the policy is modified [to apply statutory changes] upon renewal." *Bell Care*, 25 So. 3d at 16 (quoting *Moore*, 307 N.E.2d at 557) (emphasis from *Bell Care* omitted). It notes that *Moore* found the inverse also to be true; where state consent is necessary to raise premiums, the policy is construed to continue in force, not to incorporate intervening law. *Id.* (citing *Moore*, 307 N.E.2d at 557). But *Bell Care* then mistakenly concludes that Florida is in the former category, not the latter. *See id.* ("[T]he decision to raise renewal rates was thus left in the hands of the insurer."). On the contrary, Florida requires long-term care insurers to obtain consent from the state before increasing premiums. *See* Fla. Stat. § 627.410(2), (6)(a); *see also* Oral Arg. at 21:10-22 ("[CCC] cannot raise the rates unless it files for approval of the rate structure."); *id.* at 21:56-22:09 ("You have no choice but to file for the rate increases.").

And *Bell Care*'s treatment of *Oates v. Equitable Assurance Society of the United States*, 717 F. Supp. 449 (S.D. Miss. 1988), is conclusory. The analysis begins by noting that both the contested policy and the policy in *Oates* were "guaranteed renewable for life." *Bell Care*, 25 So. 3d at 16; *Oates*, 717 F. Supp. at 452. The *Bell Care* policy had "semi-annual" "policy terms," and the *Oates* policy had "monthly" "terms." *Bell Care*, 25 So. 3d at 16; *Oates*, 717 F. Supp. at 452. And the insurer in both cases bargained for the limited right to raise premiums. *Compare Bell Care*, 25 So. 3d at 16 ("The [plaintiff's] policy immediately thereafter alerted 'PREMIUMS SUBJECT TO CHANGE.'"), *with Oates*, 717 F. Supp. at 452 ("The policy is maintained in force by the insured's payment of monthly premiums, the amount of which is subject to change."). Despite these similarities, *Bell Care* spurns *Oates* at the last moment, claiming that it saw "no clear

vision of one continuous contract" in the policy before it. *Bell Care*, So. 3d at 17. That's a puzzling conclusion; after pointing out similarities between the contracts, *Bell Care* declined to distinguish *Oates*'s facts even once. As we noted above, the terms of Fleming's policy confirm the parties' intention that it operate in perpetuity.

*Bell Care* does not engage with any other cases analyzing long-term care insurance policies. But the Florida Supreme Court is not above surveying other jurisdictions to inform its decisions in insurance cases. *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1227–30 (Fla. 2006). Neither are we when we're trying to forecast what a state's highest court might do. *State Auto. Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195, 198–99 (6th Cir. 2015). So, given the mountain of authority holding that "guaranteed renewable for life" long-term care insurance policies are unaffected by intervening legislation, we conclude the Florida Supreme Court would join them. *See supra* at 11–12.

Although intermediate state court decisions are "not to be disregarded by a federal court" applying state law, we hold *Bell Care* in low regard. *See FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 218–19 (6th Cir. 1990) (citation omitted) (rejecting four intermediate state court cases because it believed the state's highest court "following its own rules of insurance contract interpretation, would find, as we have found"). The Florida Supreme Court, faced with the arguments we consider here and applying de novo review, would be unlikely to adopt *Bell Care*'s reasoning. Instead, because Fleming's policy communicates a "clear vision of one continuous contract" we think the Florida Supreme Court would find that Fleming's premiums sustained her existing contract and did not create a new one.

27

**IV. Conclusion**

Because the long-term care insurance policies reveal an intent to remain in force continuously subject only to the Plaintiffs' options, we **AFFIRM** the judgments below in favor of CCC.

ROGERS, Circuit Judge, dissenting.  Notwithstanding the lucid and tightly reasoned majority opinion, this case cries out for certification of the issue presented to the Supreme Courts of Ohio and Florida.  When we decide the uncertain state law issues today, we provide no certainty for the insurance company, or the insureds, with respect to a crisp insurance coverage issue, because the supreme courts of those states are bound in no way to follow our decision, and the insurance company and the insureds cannot be entirely confident that they will.  Under the rule of *Erie R.R. v. Tompkins*, a state supreme court is not at all bound by our decision, and if one of them came to a different conclusion, we would then be bound by that.  304 U.S. 64, 78 (1938).

It is true that we ought not lightly to certify state law questions.  *E.g.*, *Devereux v. Knox Cnty., Tenn.*, ---F.4th---, 2021 WL 4304605, at \*7 (6th Cir. Sept. 22, 2021).  If we did, that would undermine the purposes of diversity jurisdiction, cause undue delay in resolving disputes, and burden the state courts with cases that we can readily resolve.  But state procedures permitting us to obtain an opinion on state law from a state supreme court are not only perfectly constitutional and fully consistent with federal statutes regarding our jurisdiction, they serve a very valuable purpose for certain types of cases.  This is one.[1]

Certification "may save 'time, energy, and resources and hel[p] build a cooperative judicial federalism.'"  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77 (1997) (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)).  A federal court's "[s]peculation . . . about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when . . . the state courts stand willing to address questions of state law on certification from a

---

[1]  Although the parties have not made a request for such certification on this appeal, we may certify a question of law to a state supreme court *sua sponte*.  *See Am. Booksellers Found. for Free Expression v. Strickland*, 560 F.3d 443, 447 (6th Cir. 2009) (citing *Planned Parenthood*, 531 F.3d 406).

federal court." *Id.* at 79 (quotation omitted). Ohio law and Florida law explicitly provide for such certification. Rule XVIII of the Rules of Practice of the Supreme Court of Ohio provides the Supreme Court of Ohio with discretion to answer questions of Ohio law certified to it by federal courts when "there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent." R. of Prac. Sup.Ct. Ohio XVIII, § 1. The Supreme Court of Ohio has emphasized the value of federal court certification where resolution of a question of Ohio is unclear, explaining that "state[ ] sovereignty is unquestionably implicated when federal courts construe state law." *Scott v. Bank One Trust Co., N.A.*, 577 N.E.2d 1077, 1080 (Ohio 1991) (per curiam). "Certification ensures that federal courts will properly apply state law." *Id.* Likewise, Florida's constitution authorizes a federal court of appeals to certify a question about state law to the Florida Supreme Court if it "is determinative of the cause and for which there is no controlling precedent of the supreme court of Florida." Fla. Const., art. V, § 3(b)(6). "Submitting uncertain questions of state law to the state's highest court by way of certification acknowledges that court's status as the final arbiter on matters of state law and avoids the potential for 'friction-generating error' which exists whenever a federal court construes a state law in the absence of any direction from the state courts." *Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 410 (6th Cir. 2008) (quoting *Arizonans for Official English*, 520 U.S. at 79).

These considerations run strong in cases involving insurance issues. We have previously recognized that "[i]n general, states are in a better position to resolve insurance issues governed by state law." *Mass. Bay Ins. Co. v. Christian Funeral Directors, Inc.*, 759 F. App'x 431, 440 (6th Cir. 2018). "[S]tates regulate insurance companies for the protection of their residents, and state courts are best situated to identify and enforce the public policies that form the foundation of such

regulation." *Allstate Ins. Co. v. Mercier*, 913 F.2d 273, 279 (6th Cir. 1990); *see also Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC*, 495 F.3d 266, 273 (6th Cir. 2007); *Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 815 (6th Cir. 2004). Where state law is controlling, we have "conclude[d] that [state] courts are in the better position to apply and interpret" their own laws on the disputed insurance issues. *Travelers*, 495 F.3d at 272.

This case is one that clearly warrants certification. Indeed, if it does not, it is hard to think of one that would.

First, the issue in question is about as purely an issue of law as issues of law get. This is not a case where the legal issue is how a provision of state law applies to some distinct set of facts that may be different from those in previous and subsequent cases. Instead there are likely hundreds of potential cases out there in Ohio and Florida with facts that are legally 100% indistinguishable on any factual basis. Like this case, all of those other cases will turn on how state insurance law and contract law is applied to long-term care insurance contracts. Overall fairness would be best served when such policies and cases are decided in the same way. Importantly as well, insurance companies need definitive guidance with respect to how to pay such claims.

Even more compellingly, when the insurance company on a yearly basis has to determine rates for the extension/renewal of these contracts, it will take into account the risk that it will have to pay on them. If it wrongly assumes it will have to pay even if the insured was not previously hospitalized, it may charge too much to cover its risk, which would end up being unfair to insureds. On the other hand, if the insurance company wrongly assumes that it will not have to pay if the insured was not previously hospitalized, it may charge too little to cover its risk, which would be

unfair to its stockholders. If it goes down the middle, basing charges in part on a legal guess as to how a future state court will decide, there will ultimately be fairness for no one.

Certification to the state supreme courts would avoid all this. Once the state supreme court rules, everyone will get what is due under the law, and the insurance company can fairly calculate what the premium should be in light of what it will risk having to pay out under state law.

The fact that the case involves interpretation of a state statute regulating insurance makes it particularly suited to waiting for a state court ruling, especially when such a course is available at our discretion. In rulings that a court abused its discretion in entering a declaratory injunction that depended on a state-law determination, we have emphasized that declining to exercise that discretion may be inappropriate where there are unresolved questions of state law concerning state regulated insurance contracts. *See Scottsdale Inc. v. Roumph,* 211 F.3d 964, 969 (6th Cir. 2000); *Bituminous*, 373 F.3d at 815–16. "In general, states are in a better position to resolve insurance issues governed by state law." *Mass. Bay*, 759 F. App'x at 440 (citing *Flowers*, 513 F.3d at 560). "The states regulate insurance companies for the protection of their residents, and state courts are best situated to identify and enforce the public policies that form the foundation of such regulation." *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446, 448 (6th Cir. 1991) (quoting *Mercier*, 913 F.2d at 279). We have recognized that "even in cases where state law has not been difficult to apply, this court has usually found that the interpretation of insurance contracts is closely entwined with state public policy." *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 401 (6th Cir. 2019).

This is moreover not a case where the clarity of state law weighs against certification. There is no on-point authority from either the Ohio Supreme Court or Florida Supreme Court on the question presented. Arguments for each side rely variously on cases dealing with differing

kinds of insurance, on cases from other jurisdictions, and on inferences from other provisions of the state insurance code. Moreover, in Florida an intermediate state court ruled, in a case far more on point than any other cited regarding Florida (or Ohio) law, that the insurance policies *did* incorporate intervening changes in the law. *Bell Care Nurses Registry, Inc. v. Cont'l Cas. Co.*, 25 So. 3d 13, 19 (Fla. Dist. Ct. App. 2009). This is not to say that if Florida lacked a certification procedure we would be bound to follow the holding of an intermediate state appellate court. It is to be sure only a factor to take into account. *Comm'r of Internal Revenue v. Est. of Bosch*, 387 U.S. 456, 465 (1967). But just the fact that we may reject the *Bell Care* reasoning hardly requires the conclusion that the Florida Supreme Court would do so. The Florida Supreme Court could well rule just as the intermediate court did, and we would be bound to follow it, warts and all. Indeed, intermediate state court decisions "ascertaining state law" are "not to be disregarded by a federal court," and "a federal court should not reject a state rule just because it was not announced by the highest court of the state, even if the federal court believes that the rule is unsound in principle." *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 218–19 (6th Cir. 1990).

While we may genuinely conclude that our reading of the state statutes involved is more logical, more legally coherent, and more textually coherent, that may all be true but still not tell us compellingly that the supreme courts of the two states will rule that way. They may, for instance, weigh public policy reflected in the statutes in question much more liberally than we would. For example, in *Bell Care*, the Florida District Court of Appeals considered a nearly identical case in the context of the same statutory scheme at issue here, concluding that the insurer's attempt to wriggle out of providing benefits was contrary to Florida judicial precedent and likely violated state public policy. 25 So. 3d at 15–18. The public policy against the insurance contract provisions at issue here is compelling. Permitting an insurer to collect premiums for decades, then turn around

33

and deny any coverage based on a minor but often enforced contractual provision with little relation to the nature of the risk insured against in the interim, plainly presents problems of fundamental fairness. But under the insurance company's precise technical interpretation of the insurance policy language and the statute, everyone who paid premiums on such an insurance policy will have the Hobson's choice of getting a new policy at the higher premium required of older initial applicants for insurance, or continuing to extend and pay for the old unfair policy. If the Florida Supreme Court were to read the statutory provisions more liberally to avoid such a result, we would be in no position to say that was wrong, however sure we are that we would not have voted that way. The same is true for the Ohio Supreme Court, although the case for certification concededly lacks the compelling factor of a contrary intermediate court decision.

In short, I would exercise the discretion that we have to certify the controlling issue in each of these two cases to the respective state supreme court.